JUSTICE REGNIER
delivered the Opinion of the Court.
¶1 James William Boyer appeals from an order issued by the Seventeenth Judicial District Court, Phillips County, which denied his motion to suppress evidence. We affirm.
¶2 The sole issue on appeal is whether the District Court erred in denying Boyer’s motion to suppress.
BACKGROUND
¶3 On Sunday, April 18, 1999, Warden Steve Jones of the Department of Fish, Wildlife and Parks (Department) was patrolling by boat a portion of the Missouri River bordering Phillips County, Montana. Jones observed a boat anchored in the river which appeared unoccupied. Concerned for the prospective passengers’ safety, Jones pulled his boat alongside the anchored boat and observed Boyer lying on the floor. Boyer sat up and told Jones he was just waking up from a nap. Jones inquired into Boyer’s safety and Boyer stated that he was okay.
¶4 Upon further questioning, Boyer indicated that he had been fishing since Friday and produced his Montana fishing license. Additionally, Boyer disclosed that he had fish in his possession, stored in the boat’s live well. Jones requested to see his catch. Boyer suggested Jones could inspect the catch later in the evening at a boat launch. Jones rejected this suggestion and Boyer reluctantly removed eight fish from the live well. At that time, the combined possession limit for sauger and walleye was ten fish.
¶5 In order to inspect the fish, Jones tied the boats together and stepped onto the transom, an exterior platform attached to the rear of Boyer’s boat. From this vantage point, Jones could see that Boyer’s live well, which was open, contained additional fish in excess of the legal possession limit. Boyer allowed Jones to remove the additional fish. Jones determined that Boyer had nineteen dead sauger and walleye in his possession. Jones confiscated the excess fish and issued Boyer a notice to appear for the possession of unlawfully killed game fish.
¶6 Boyer was convicted in Justice Court of possession of unlawfully killed game fish in violation of § 87-3-112(2), MCA. Boyer appealed *279 that conviction to the District Court and filed a motion to suppress the evidence. After a hearing on the matter, the District Court found that no search occurred as Boyer did not have a reasonable expectation of privacy in his boat on a public waterway. Therefore, the District Court denied Boyer’s motion. It is from this denial that Boyer appeals.
STANDARD OF REVIEW
¶7 In reviewing a district court’s denial of a motion to suppress evidence, we determine whether the court’s findings of fact are clearly erroneous and whether the court’s interpretation and application of the law is correct. State v. Reesman, 2000 MT 243, ¶ 18, 301 Mont. 408, ¶ 18, 10 P.3d 83, ¶ 18.
DISCUSSION
¶8 Did the District Court err in denying Boyer’s motion to suppress?
¶9 On appeal, Boyer argues that several of the District Court’s findings constitute reversible error. First, Boyer argues that Jones initiated an investigatory stop on Boyer without the requisite particularized suspicion of wrongdoing. Further, Boyer insists that Jones unlawfully compelled production of his fishing license and catch. Finally, Boyer claims Jones performed an illegal search in stepping onto the back of his boat to inspect the fish and live well. We address each of Boyer’s contentions below.
A. Jones’ Initial Advance on Boyer’s Boat
¶10 Boyer contends Jones’ initial advance on his boat constituted an unlawful investigatory stop. Boyer argues that the District Court should have suppressed the inculpatory evidence revealed by Jones’ inspection because Jones admitted having no particularized suspicion that the boat occupants had committed, were committing, or were about to commit an offense. See Section 46-5-401, MCA. Boyer’s reliance on the investigatory stop statute and case law in support of his position is ill founded.
¶11 We have previously stated that:
Legal stops can also occur in noncriminal, noninvestigatory contexts. For example nothing prevents a police officer from making a stop to deliver an emergency message, assist a stranded motorist or warn of an impending danger. A police officer can legally stop a vehicle for a bona fide reason which is related to functions within his authority and duties.
Grinde v. State (1991), 249 Mont. 77, 81, 813 P.2d 473, 476, overruled *280 on other grounds by Bush v. Montana DOJ, Motor Vehicle Div., 1998 MT 270, 291 Mont. 359, 968 P.2d 716. Game wardens, appointed pursuant to § 87-1-501, MCA, are authorized officers with the authority to enforce the laws and adopted rules relating to parks and outdoor recreation contained in Title 23, Chapters 1 and 2 (excepting Part 7 in Chapter 2), MCA. Section 23-1-122(1), MCA. Section 23-2-501, MCA, provides that ‘[i]t is the policy of this state to promote safety for persons and property in and connected with the use, operation, and equipment of [watercraft] ....’
¶12 On January 25,2000, the District Court held a hearing on Boyer’s motion to suppress. At the suppression hearing, Jones testified that an initial concern for the prospective occupants’ safety drew his attention to Boyer’s boat. From a distance, Boyer’s boat appeared unoccupied. As Jones did not see anyone in the boat or on the surrounding shoreline, Jones testified that he was concerned that somebody may have ‘fallen overboard or something of that nature.’ Therefore, he inquired into the situation by approaching Boyer’s boat.
¶13 Clearly, in approaching Boyer’s boat, Jones acted within his express authority. We would never seek to discourage wardens or other law enforcement officials from assisting persons in potential distress. Thus, the District Court correctly determined that Jones lawfully approached Boyer’s boat.
B. Request to Produce License and Catch
¶14 Boyer contends that if we conclude Jones’ initial advance on his boat was a lawful ‘welfare check,’ the welfare check and Jones’ corresponding safety concerns ended when Boyer responded that he was okay. In proceeding further, Boyer argues that Jones detained Boyer to request production of his fishing license. Therefore, Boyer states that Jones needed a particularized suspicion of wrongdoing, as required prior to initiating an investigatory stop, to effectuate the detention and request for Boyer’s fishing license. Further, Boyer asserts that since he evinced an expectation of privacy in his catch by placing the fish in a concealed live well, Jones needed probable cause to inspect Boyer’s catch. Boyer contends that Jones had neither a particularized suspicion or probable cause. Therefore, Boyer maintains that all of the evidence gathered by Jones following the initial welfare check must be suppressed.
1. The License Request
¶15 Section 87-2-109, MCA, provides:
(1) Except as provided in 87-2-114(2), it is unlawful for a *281 person to whom a license or permit has been issued to fish ... unless the person is carrying the required license, licenses, or permit at the time.
(2) It is unlawful to refuse to exhibit a license or permit and the identification used in purchasing a license or permit for inspection to a warden or other officer requesting to see it.
Further, § 87-1-502(3), MCA, provides that wardens shall see that persons who fish possess the requisite licenses. Clearly, these statutes make no reference to a particularized suspicion requirement prior to requesting production of a game license.
¶16 Here, Boyer was on a fishing boat containing a visible five well. He admitted to Jones that he had been fishing for three days. Jones had the authority to request production of Boyer’s fishing license pursuant to § 87-1-502, MCA, and his request fell within the scope of that statute. Fishing or hunting license requests play a vital role in preservation of wildlife and require only a minimal privacy intrusion. However, the Montana Fishing Regulations inform anglers of this intrusion warning that ‘it is unlawful and a misdemeanor to refuse to show one’s fishing license upon demand.’ We decline Boyer’s invitation to imply a particularized suspicion provision into these statutes. Therefore, we hold that a game warden may request production of a valid hunting or fishing license when the circumstances reasonably indicate that an individual has been engaged in those activities.
2. The Request to Produce Boyer’s Catch
¶17 Boyer argues that Jones performed an unlawful warrantless search by requesting production of Boyer’s catch. The request was unlawful, according to Boyer, because Jones did not have probable cause to believe that Boyer had committed a violation at the time Jones requested production of his catch. Boyer contends that § 87-l-506(l)(b), MCA, mandates this probable cause prerequisite. Section 87-l-506(l)(b), MCA, provides:
A warden may search, without a warrant, any tent not used as a residence, any boat, vehicle, box, locker, basket, creel, crate, game bag, or package, or their contents upon probable cause to believe that any fish and game law or department rule for the protection, conservation, or propagation of game, fish, birds, or fur-bearing animals has been violated. [Emphasis added.]
¶18 The State argues that § 87-1-502(6), MCA, authorizes wardens to make suspicionless stops of persons engaged in hunting and fishing activities to inspect their game. Section 87-1-502(6), MCA, states:
A warden has the authority to inspect any and all fish, game *282 and nongame birds, waterfowl, game animals, and fur-bearing animals at reasonable times and at any location other than a residence or dwelling. Upon request therefor, all persons having in their possession any fish, game and nongame birds, waterfowl, game animals, and fur-bearing animals shall exhibit the same and all thereof to the warden for such inspection.
Boyer asserts that we must read this statute in conjunction with the game wardens’ enforcement powers articulated in § 87-l-506(l)(b), MCA. In doing so, Boyer argues that we must imply a ‘probable cause’ standard into § 87-1-502(6), MCA. However, Boyer’s position presupposes that the request to exhibit game qualifies as a search for purposes of Article II, Sections 10 and 11 of the Montana Constitution. An impermissible search and seizure only occurs within the meaning of Article II, Section 10 of the Montana Constitution when a reasonable expectation of privacy has been breached. See State v. Scheetz (1997), 286 Mont. 41, 46, 950 P.2d 722, 724-25. The precise inquiry, then, is whether Boyer is entitled to a reasonable expectation of privacy in the game fish he possessed.
¶19 When analyzing search and seizure questions that specially implicate the right of privacy under Montana’s Constitution, we consider Sections 10 and 11 of Article II of the Montana Constitution. State v. Bassett, 1999 MT 109, ¶ 23, 294 Mont. 327, ¶ 23, 982 P.2d 410, ¶ 23. Article II, Sections 10 and 11 of the Montana Constitution provide:
Section 10. Right of privacy. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.
Section 11. Searches and seizures. The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.
¶20 To determine the threshold question of whether there has been an unlawful government intrusion into one’s privacy, this Court looks to the following factors: (1) whether the person has an actual expectation of privacy, (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the state’s intrusion. Bassett, ¶ 24. Where no reasonable expectation of privacy exists, there is neither a ‘search’ nor a ‘seizure’ within the contemplation of Article II, Sections 10 and 11 of the Montana *283 Constitution. See State v. Bullock (1995), 272 Mont. 361, 377, 901 P.2d 61, 71.
¶21 Boyer argues that placing his fish in a closed five well evinced his actual expectation of privacy in his catch which was reasonable. The State offered no evidence at the suppression hearing contradicting Boyer’s subjective expectation of privacy. However, the State argues that Boyer’s subjective expectation of privacy is not one which society is willing to recognize as reasonable. We agree for the reasons set forth below.
¶22 Article IX, Section 1(1) of the Montana Constitution provides that ‘[t]he state and each person shall maintain and improve a clean and healthful environment in Montana for present and future generations.’ To safeguard Montana’s wildlife for present and future generations, the Legislature provided for the appointment of game wardens to ‘enforce the laws of this state and the rules of the [Department with reference to the protection, preservation, and propagation of game and fur-bearing animals, fish, and game birds.’ Section 87-1-502(2), MCA. Such a system includes the ability of game wardens to inspect game in the field. It also encompasses proper licensing and specific game limitation requirements. Those who apply to the State for permission to harvest or remove Montana’s natural game are on notice that they are rightfully subject to such regulations. In summary, our Constitution, laws, and regulations mandate special considerations to assure that our wild places and the creatures that inhabit them are preserved for future generations.
¶23 With these considerations in mind we now consider Boyer’s contention that wardens must have probable cause of wrongdoing to request production of an angler’s concealed catch. Since taking or possessing fish is not illegal per se, simply observing someone catching and keeping fish would not give rise to probable cause of a fish and game violation. Boyer’s proposition would virtually require wardens or third parties to have personal knowledge of fish and game violations prior to conducting the contemplated inspection. Montana’s vast geography, the anglers’ somewhat uninhibited freedom of movement, and the remoteness from warrant issuing magistrates and law enforcement entities would severely impede game violation investigations. The inevitable result would be the unnecessary depletion of Montana’s wildlife and fish which we are all bound to protect and preserve. We decline to impose this burden.
¶24 Our holding today should come as no surprise to outdoor enthusiasts. As alluded above, the Montana Fishing Regulations *284 inform anglers of the requirement to produce their license and catch upon demand. To fish is a privilege accorded by the State, not a private right. Anglers are responsible for knowing the laws pertaining to their sport. See State v. Huebner (1992), 252 Mont. 184, 188, 827 P.2d 1260, 1263. In complying with the well established license requirements, anglers acknowledge the prospect of at least some governmental intrusion into their activities. In engaging in this highly regulated activity, anglers must assume the burdens of the sport as well as its benefits. Thus, no objectively reasonable expectation of privacy exists when a wildlife enforcement officer checks for hunting and fishing licenses in open season near game habitat, inquires about game taken, and requests to inspect game in the field. In this capacity, game wardens are acting not only as law enforcement officers, but as public trustees protecting and conserving Montana’s wildlife and habitat for all of its citizens.
¶25 Finally, we consider the nature of the State’s intrusion in conducting inspections without suspicion. A typical license or game inspection should require no more inquiry than: (1) Have you been fishing today?; (2) Do you have a valid Montana fishing license?; and (3) Do you have any fish in your possession? In fact, Jones asked Boyer these very questions. The stops eliciting answers to these questions maintain close geographical and temporal ties to fishing activities. To the average law abiding angler, this line of questioning consumes little time and creates negligible anxiety, restriction of movement, and inconvenience. Legitimate anglers should experience minimal interference and the non-fishing segment of the population will proceed virtually uninhibited.
¶26 Boyer’s claim that he had a legitimate expectation of privacy in his catch as he enjoyed the peace and tranquility of the Missouri River reeks of irony as his peaceful and tranquil poaching threatened the river’s resources for future generations. For the foregoing reasons, we conclude that society is not willing to recognize an angler’s subjective expectation of privacy in his or her catch as objectively reasonable. As such, we hold that Jones’ request for and inspection of Boyer’s catch was not a search. Therefore, the probable cause requirement contemplated in § 87-l-506(l)(b), MCA, does not apply.
C. Stepping on Boyer’s Boat
¶27 We now turn to the most important phase of our inquiry. We have already concluded that Jones lawfully approached Boyer’s boat to conduct a welfare check. To conduct this check, Jones pulled his boat *285 alongside Boyer’s and held the two boats together with his. hands. Jones then lawfully requested Boyer’s fishing license. After Boyer admitted to fishing, Jones lawfully requested to see Boyer’s catch. Boyer suggested a later time for the inspection and Jones declined this suggestion. Boyer then opened the live well and reluctantly removed eight fish. After removing these fish from the five well and leaving it open, Boyer again requested that Jones conduct the inspection at a later time. At this juncture Jones drifted to the downstream end of Boyer’s boat and tethered the boats together. Jones then stepped onto the transom of Boyer’s boat to inspect his catch.
¶28 Prior to tying the boats together, Jones merely requested production of Boyer’s license and catch. Jones did not need a particularized suspicion to make such requests. In making the requests, Jones did not seize Boyer by restraining his freedom of movement. See State v. Reynolds (1995), 272 Mont. 46, 49, 899 P.2d 540, 542. However, Jones’ subsequent act of tying the boats together did restrain Boyer’s freedom of movement. Therefore, Jones initiated an investigative stop at the instant he tied the boats together.
¶29 To stop a person, an officer must have a particularized and objective basis for suspecting the particular person of criminal activity. State v. Farabee, 2000 MT 265, ¶ 14, 302 Mont. 29, ¶ 14, 22 P.3d 175, ¶ 14. In Farabee, we recognized that for the State to prove the existence of a particularized suspicion, the State must show: (1) objective data from which an experienced police officer can make certain inferences; and (2) a resulting suspicion that the occupant of the vehicle is or has been engaged in wrongdoing or was witness to criminal activity. Farabee, ¶ 14. The Montana Legislature has codified these principles in § 46-5-401, MCA. Farabee, ¶ 14. Whether a particularized suspicion exists to justify an investigative stop is a question of fact which is dependent on the totality of the circumstances. Farabee, ¶ 14.
¶30 At the suppression hearing, Jones testified that he had a reasonable suspicion that a fishing violation had occurred. Clearly, to Jones, Boyer’s conduct created suspicion of wrongdoing. Jones testified that requesting production of a fishing license and catch on patrol was routine. He further testified that in his opinion licensed anglers are aware of the statutory requirement to present their catch upon request. Boyer’s reluctance to present his catch did provide objective data upon which a warden could suspect wrongdoing. We conclude that Boyer’s actions support a determination of particularized suspicion justifying an investigative stop.
*286 ¶31 The dissent makes note that Jones testified at the hearing that he did not have probable cause at this juncture that a crime had been committed. Whether or not probable cause existed at this instant, however, is not relevant. Jones testified that he had a reasonable suspicion that an offense had occurred. It is the presence of reasonable suspicion that allowed Jones to proceed with the investigative stop.
¶32 After Jones initiated the investigative stop, Boyer claims that Jones performed an illegal search when he stepped onto the transom of Boyer’s boat to inspect the live well. The State argues that Jones’ actions did not constitute a search because Boyer did not have a reasonable expectation of privacy in the transom on his boat. Again, we consider the three privacy factors referenced above to determine whether Jones’ act of stepping on the rear platform of Boyer’s boat constituted a search.
¶33 Under these circumstances, we believe that the nature of Jones’ intrusion was so minimal as not to violate any alleged privacy interest that Boyer may have had. As noted above, § 87-1-502(6), MCA, authorized Jones to inspect Boyer’s catch. In attempting to inspect Boyer’s catch, Jones merely placed a foot upon the transom of Boyer’s boat-an exterior platform which was readily accessible to the public. In so doing, Jones did not disturb any personal property or gain access to any place not readily visible from a higher vantage point. Compare State v. Bullock (1995), 272 Mont. 361, 901 P.2d 61 and State v. Romain (1999), 295 Mont. 152, 983 P.2d 322 (holding that an officer’s warrantless entry on private property which is fenced, gated, and posted with ‘No Trespassing’ or similar signs constitutes an unlawful search).
¶34 We have recently held that a homeowner does not have an objectively reasonable expectation of privacy regarding the use of unposted and unobstructed property leading to the front door of a home, including the porch. State v. Hubbel (1997), 286 Mont. 200, 210, 951 P.2d 971, 977. The transom used by Jones is similar to a porch abutting a house, although certainly a home is more private and protected than a fishing boat on a public waterway.
¶35 We would also point out that the live well was open when Jones made his observations. A live well on a fishing boat would not typically contain anything other than river water and fish. Jones’ actions were no more invasive than a game warden looking into the open canopy of a pickup, or a police officer observing contraband on the floor of an automobile in connection with an investigative stop. They were certainly no more invasive than a game warden stepping on a bumper *287 of a pickup to inspect a tagged deer or elk.
¶36 We hold that Boyer had no legitimate expectation of privacy that society is willing to recognize as objectively reasonable in the rear platform on his boat. Consequently, Jones’ act of stepping on the transom did not constitute a search. Therefore, contrary to the dissent’s behest, we need not indulge in a lengthy discussion of whether Jones had probable cause to step on the transom.
¶37 Once Jones lawfully stepped on the transom, he could see into the open live well. This plain view observation revealed that Boyer possessed additional fish, in excess of his legal limit. Jones’ observation allowed him to remove the excess fish from Boyer’s live well and issue the unlawfully killed game fish citation. Therefore, the District Court did not err in denying Boyer’s motion to suppress.
¶38 Attempting to equate this case to an automobile search, Boyer’s argument is replete with references and analogies to State v. Elison, 2000 MT 323, 302 Mont. 228, 14 P.3d 456. In Elison, after initiating an investigatory stop, the officer requested that the defendant exit his vehicle. After the defendant admitted to stowing marijuana behind a seat, the officer opened the vehicle’s door, tilted the driver’s seat forward, and discovered a film canister which he removed and opened. During the search, the officer also observed a paper bindle, a two-inch tube, and a razor blade on the seat and floor board. The defendant filed a motion to suppress the evidence which the district court denied. We concluded that an individual does not surrender a privacy interest in items which the individual takes precaution to conceal from public access simply because the items happen to be in an automobile. Elison, ¶ 51. Since none of the warrantless search exceptions applied to the officer’s search, we reversed the district court’s denial of Elison’s motion to suppress.
¶39 The critical distinction between Elison and the case at bar is the second privacy factor of the three-prong test articulated above. We have defined ‘search’ as the use of some means of gathering evidence which infringes upon a person’s reasonable expectation of privacy. Elison, ¶ 48. In Elison, we acknowledged that individuals have a reasonable expectation of privacy in the items stowed behind their automobile seats. Elison, ¶ 49. Here, we concluded that an individual does not have an objectively reasonable expectation of privacy in game fish since: he or she has a constitutional duty to maintain and improve a clean and healthful environment; the Legislature enacted § 87-1-502(6), MCA, charging anglers with the duty to produce fish in their possession for inspection; and the Montana Fishing Regulations notify *288 anglers of this duty to produce their fish. Therefore, the request for and inspection of an angler’s catch does not constitute a search.
¶40 We further concluded that individuals have no objectively reasonable expectation of privacy in the transom on their boat. It is with this conclusion that the dissent takes us to task and cites a laundry-list of cases for the proposition that boats on public waterways enjoy the same search and seizure protections as automobiles on public highways. Accordingly, Justice Nelson concludes that ‘individuals boating on Montana’s public waterways have a reasonable expectation of privacy in their boats and in items stowed therein beyond the purview of the public.’ Thus, the dissent emphatically suggests that we have failed to address Boyer’s legitimate and reasonable expectation of privacy in his boat and its contents.
¶41 We disagree. Here, in an effort to inspect Boyer’s catch, Jones did nothing more than step onto the transom of Boyer’s boat. Boyer argues on appeal that this action constituted an unlawful search. The dissent echoes the same argument. Our fundamental disagreement with both Boyer and the dissent focuses on Jones’ decision to step on the transom of the boat. We simply believe that Boyer did not have a legitimate expectation of privacy in the transom on his boat that society is willing to recognize as objectively reasonable. As previously stated, what occurred here was no different than a game warden stepping on the bumper or running board of a pickup to get a better view of a tagged animal. We suspect this occurs on numerous occasions throughout hunting season in Montana without hunters thinking that their rights of privacy have been invaded.
¶42 Since Boyer did not have a privacy interest in the transom on his boat, a search never occurred. Once Jones lawfully occupied the transom on Boyer’s boat, he could see the live well’s contents in plain view. Jones did not conduct a search of the boat, look under the seats, remove or rearrange any personal belongings, or even open the top of the live well. By comparison, the actions of the officer in Elison were far more invasive. There, the officer actually opened the door of the vehicle and conducted a search of the interior. The search included tilting the driver’s seat forward to inspect for contraband. In doing so, the officer found a film canister which he then opened and discovered marijuana. The search proceeded and the officer found a paper bindle located next to the film canister as well as a two-inch tube on the seat and a razor blade on the floor board.
¶43 In our view the facts presented in Elison are clearly and quite properly distinguishable. Boyer’s right to privacy was not violated and *289 the District Court was correct in denying his motion to suppress.
¶44 Affirmed.
CHIEF JUSTICE GRAY, JUSTICES COTTER and RICE concur.