JUSTICE NELSON
specially concurs.
¶53 I concur in our Opinion. That said, it is, nonetheless, worth observing that this case represents what can only be described as a serious breakdown in an important part of the regulatory scheme of State government.
¶54 As touched upon in ¶ 33 of our Opinion, the statutes governing FWP’s jurisdiction and authority to ensure the health, safety and integrity of Montana’s native wildlife population are ultimately grounded in the State’s obligation under Article IX, Section 1, of Montana’s Constitution to “maintain and improve,” for the benefit of “present and future generations,” Montanans’ Article II, Section 3, fundamental constitutional right to “a clean and healthful environment.” See State v. Boyer, 2002 MT 33, ¶ 22, 308 Mont. 276, ¶ 22, 42 P.3d 771, ¶ 22, wherein we stated-in upholding a game warden’s search for and seizure of over-limit fish in a five well in a boat-that “our Constitution, laws and regulations mandate special considerations to assure that our wild places and the creatures that inhabit them are preserved for future generations.”
¶55 It can hardly be gainsaid that if, as the Attorney General argued in Boyer, over-fishing implicates the “clean and healthful environment” protections of Montana’s Constitution, then, for the reasons set forth in ¶¶ 23-28 of our Opinion, the release of game farm elk into the wild carries with it the potential for an environmental disaster of truly monumental proportions.
¶56 With that in mind, and, recognizing the State’s obligation to protect, maintain and improve the environment, it deserves special comment that, at least from the record before us, it appears that there was no communication, much less any consultation or coordination, between DOL and FWP with respect to the Wallaces’ proposed transfer of their game farm elk to the Crow Tribe. While Title 87 governs “Fish and Wildlife” and more specifically FWP, § 87-4-408, MCA, cited in ¶ 18 of our Opinion clearly indicates that FWP and DOL have interrelated functions with regard to game farm animals. See also § 87- *490 4-414 and § 87-4-415, MCA. In spite of these interrelated functions, each agency-like ships passing in the night-simply did its own thing under the statutes and regulations that pertained to its particular operations. That the involved personnel in these two State agencies failed to acknowledge a need much less any apparent legal requirement, to communicate and coordinate with each other with regard to this matter is mind-boggling given the serious environmental ramifications of allowing game farm elk to mix with, and presumably breed with, Montana’s wild elk population.
¶57 In this regard, it might be that DOL would not have permitted the transfer of Wallaces’ game farm elk if some sort of pre-permit assessment of environmental impacts had been conducted under Title 75, Chapter 1, Part 2, MCA (the “Montana Environmental Policy Act or MEPA). Of course, on the record here, it appears that DOL was not even aware of the potential environmental threats that had been identified by its sister agency, FWP, and which the Wallaces’ intended course of conduct posed. Again, this points up the break down of communication and coordination between the two State agencies involved in this case, and, more importantly, the failure of the State to discharge its constitutional obligation to protect the environment through its agencies and governing regulatory scheme.
¶58 In short, given that Article IX, Section 1, of our Constitution clearly and unambiguously imposes upon the State the obligation to “maintain and improve a clean and healthful environment in Montana for present and future generations,” the Legislature, under Article IX, Section 2, has a concomitant obligation to “provide for the administration and enforcement of this duty” by adopting laws that ensure the right hand of State government knows what the left hand is doing.