No. 03-392

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 234

STATE OF MONTANA,

       Plaintiff and Respondent,

  v.

REBEKAH MICHELLE SMITH,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and For the County of Beaverhead, Cause No. DC-02–2891
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

          Wendy Holton, Attorney at Law, Helena, Montana

       For Respondent:

          Hon. Mike McGrath, Attorney General; Jim Wheelis,
Assistant Attorney General, Helena, Montana

          W. G. Gilbert, III, Dillon City Attorney, Dillon, Montana

Submitted on Briefs: January 6, 2004

Decided: August 31, 2004

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Rebekah Michelle Smith (Smith) appeals from an order of the Fifth Judicial District Court, Beaverhead County, entered on March 28, 2003, denying her motion to suppress evidence obtained after a warrantless search of a home she occupied as a party guest. We reverse.

¶2     The issue on appeal is whether the District Court erred in denying Smith's motion to suppress.

### FACTUAL AND PROCEDURAL BACKGROUND

¶3     In the early morning hours of October 19, 2001, Dillon City Police Officer Don Guiberson (Officer Guiberson) and several other officers responded to a complaint about loud noise and the smell of marijuana coming from the apartment of Roslyn Tash (Tash), with whom Officer Guiberson was acquainted. When they arrived at Tash's apartment, the officers did not notice a marijuana odor. However, they confirmed noise coming from inside the apartment, which sounded like people socializing or having a loud party. The officers knocked on the apartment door, and were given permission to enter by Kenneth Decker (Decker), a twenty-one year old male guest. As the officers entered, Officer Guiberson recognized Tash as the tenant of the apartment. While Tash did not object to the officers' presence in the apartment, the officers had not requested her permission to enter.

¶4     When the officers arrived at Tash's apartment, Smith was in the bathroom with the door closed. She was in the process of becoming ill when Tash went in to check on her. Tash later exited the bathroom, pulling the door closed behind her. Shortly thereafter,

2

Officer Guiberson heard vomiting from behind the closed door of the bathroom. Without knocking, Guiberson opened the door and found Smith curled up on the floor, hugging the toilet, with her head in the toilet bowl. Officer Guiberson smelled what he believed was an intoxicating substance, and concluded that Smith was intoxicated. As a result of this encounter, Smith, 18, was charged with possession of an intoxicating substance while under 21 years of age, in violation of § 45-5-624, MCA (2001).

¶5 On November 6, 2001, Smith appeared before the City Court of the City of Dillon and pleaded not guilty to the offense charged. Following a bench trial on March 19, 2002, Smith was found guilty of possessing an intoxicating substance while under 21 years of age and given a deferred sentence. On April 16, 2002, Smith appealed the judgment to the District Court for a trial *de novo*. She thereafter moved to suppress the evidence obtained as a result of the officers' warrantless search of Tash's apartment on October 19, 2001. The District Court denied the motion after a hearing and Smith entered a conditional plea of guilty, reserving her right to appeal from the denial of her motion to suppress. This appeal followed.

## STANDARD OF REVIEW

¶6 We review a district court's denial of a motion to suppress evidence to determine whether the court's findings of fact are clearly erroneous and whether they are correctly applied as a matter of law. *State v. May*, 2004 MT 45, ¶ 8, 320 Mont. 116, ¶ 8, 86 P.3d 42, ¶ 8.

## DISCUSSION

3

¶7     **Did the District Court err in denying Smith's motion to suppress?**

¶8     Smith challenges the warrantless search of Tash's apartment on the basis that Decker, who was also a party guest on the evening of October 19, 2001, did not have actual authority to consent to the officers' entry and subsequent search of the apartment and that Tash's failure to object to the officers' presence did not amount to free and voluntary consent. She submits that, in the absence of effective consent, the officers' search of the apartment was illegal from its inception and all the evidence obtained as a result of the search must be suppressed.   The State responds that Smith lacks the requisite standing to contest the officers' initial entry into the apartment since she was merely a transient party guest on the evening in question and thus had no reasonable expectation of privacy in the common areas within the apartment.  We agree.

¶9     The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect citizens against unreasonable searches and seizures. The right to be free from unreasonable searches and seizures is augmented by Article II, Section 10 of the Montana Constitution, which reads:

> **Right of privacy.**  The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

"When analyzing search and seizure questions that specially implicate the right of privacy under Montana's Constitution," Sections 10 and 11 are read together. *State v. Boyer*, 2002 MT 33, ¶ 19, 308 Mont. 276, ¶ 19, 42 P.3d 771, ¶ 19.  An impermissible search and seizure occurs within the meaning of Article II, Section 10 of the Montana Constitution when a

4

reasonable expectation of privacy has been breached. *Boyer*, ¶ 18. However, where no reasonable expectation of privacy exists, there is neither a "search" nor a "seizure" within the contemplation of Article II, Sections 10 and 11 of the Montana Constitution. *Boyer*, ¶ 20. Thus, the "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois* (1978), 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387.

¶10    Thus, the salient question in this case is whether Smith, as a transient party guest, held a sufficient expectation of privacy in the apartment of Roslyn Tash to contest the legality of the search. *See State v. Bowman*, 2004 MT 119, ¶ 22, 321 Mont. 176, ¶ 22, 89 P.3d 986, ¶ 22. To determine this question, we consider the following factors: (1) whether Smith had an actual expectation of privacy in the apartment; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the state's intrusion. *Boyer*, ¶ 20.

¶11    Unlike Roslyn Tash, the apartment lessee, Smith did not enjoy a property interest in the common areas of the apartment. Nor did she have a right to exclude from the apartment anyone lawfully therein. Rather, Smith's expectation of privacy in the common parts of the apartment (i.e., kitchen, living room, hallway) was particularly tenuous since Tash, or any other third party possessing common authority over or a sufficient relationship to the premises or effects sought to be inspected, could have validly consented to a police search of those premises or effects. *See United States v. Matlock* (1974), 415 U.S. 164, 171, 94

S.Ct. 988, 993, 39 L.Ed.2d 242. Since Tash, by virtue of her property rights, *could have* consented to a police search of the apartment, Smith cannot claim that she legitimately expected privacy from the police in the common areas of the apartment, and thus seek Fourth Amendment protection.

¶12 However, Smith also challenges the warrantless search on the basis that she possessed a privacy interest in the bathroom of the residence. A substantial line of state cases have recognized that occupants of public restrooms have a reasonable expectation of privacy. *Brown v. State* (Md. App. 1968), 238 A.2d 147; *State v. Bryant* (Minn. 1970), 177 N.W.2d 800; *Buchanan v. State* (Tex. Crim. App. 1971), 471 S.W.2d 401; *People v. Mercado* (N.Y. 1986), 501 N.E.2d 27; *People v. Kalchik* (Mich. App. 1987), 407 N.W.2d 627. This is because most people using a public restroom have no reason to suspect a government intrusion. *People v. Triggs* (Cal. 1973), 506 P.2d 232, 236 (overruled on other grounds). Use of a private bathroom provides similar expectations. By entering the bathroom and closing the door behind her, Smith had a legitimate expectation that her activities would be private and that no unauthorized persons would enter. This expectation was reasonable given the personal and private nature of one's usual activities within a bathroom. Similarly, we have held that "[p]lacing an object beyond the purview of the public in a place from which the person has the right to exclude others evidences an actual or subjective expectation of privacy." *State v. Elison*, 2000 MT 288, ¶ 49, 302 Mont. 228, ¶ 49, 14 P.3d 456, ¶ 49. Under the circumstances of this case, we hold that Smith had a legitimate expectation of

6

privacy while in Tash's bathroom, and hence may claim the protections of the Fourth Amendment and the Montana Constitution.

¶13    The next question is whether or not the nature of the State's intrusion was reasonable under the circumstances. *See State v. Tackitt*, 2003 MT 81, ¶ 17, 315 Mont. 59, ¶ 17, 67 P.3d 295, ¶ 17. The State argues that Officer Guiberson's entry into the bathroom was justified under the "community caretaker doctrine," recognized by this Court in *State v. Lovegren*, 2002 MT 153, ¶ 25, 310 Mont. 358, ¶ 25, 51 P.3d 471, ¶ 25. Smith counters that the circumstances did not give rise to a reasonable belief that she was experiencing a life-threatening illness, or was in need of immediate assistance.

¶14    The community caretaker doctrine stands for the proposition that police officers have a duty not only to fight crime, but also to investigate uncertain situations in order to ensure public safety. *State v. Nelson*, 2004 MT 13, ¶ 6, 319 Mont. 250, ¶ 6, 84 P.3d 25, ¶ 6. The community caretaker function of the police is typically the least intrusive form of contact between the police and the public. Under the three-pronged test established in *Lovegren*, an officer may stop and investigate a situation when the officer has objective, specific, and articulable facts upon which to base a suspicion that a citizen is in need of help or is in peril. Once the officer has determined that the citizen is in need of assistance, then the officer may take appropriate action to render aid or mitigate the peril. However, as soon as the officer is assured that the citizen is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating not only the

protections provided by the Fourth Amendment, but also those further guarantees afforded by the Montana Constitution. *Lovegren*, ¶ 25; *Nelson*, ¶ 7.

¶15 While there may be circumstances which would allow an officer to enter a bathroom on the belief that someone is in need of emergency care or assistance, the facts do not warrant such an intrusion in this case. Officer Guiberson and the other officers arrived at Tash's apartment in response to a noise disturbance complaint. Once on the premises, they observed underage drinking but perceived no threat of danger. Although Officer Guiberson heard vomiting from within the bathroom as he passed by, it was not necessary for him to gain immediate entry into the bathroom in order to investigate the situation further. Rather, Guiberson could have asked the other occupants of the apartment about the situation, or knocked on the bathroom door and inquired. In the absence of objective, specific and articulable facts supporting the conclusion that Smith was in need of officer assistance, we decline to invoke the community caretaker doctrine under these circumstances.

¶16 This conclusion does not, as the dissent suggests, create a "new rule" defining a bathroom as a "bust-free" zone to which partyers can retreat to avoid police contact. We simply hold that the caretaker doctrine – the only rationale in support of police action offered by the State here – did not justify entry into the bathroom and impingement of the defendant's privacy interests under circumstances which provided alternate means of immediately determining her well-being.

¶17 Because we conclude that Smith held an expectation of privacy in the bathroom of Tash's apartment and that Officer Guiberson's entry into the bathroom was not justified by

the community caretaker doctrine, we necessarily reverse the District Court's order denying

Smith's motion to suppress and remand for further proceedings consistent with this opinion.

¶18     Reversed and remanded for further proceedings consistent herewith.


                                              /S/ JIM RICE


We concur:

/S/ KARLA M. GRAY
/S/ PATRICIA O. COTTER
/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON

Justice John Warner Dissents.

¶19     I agree with the Court's opinion Defendant Smith cannot claim she legitimately expected privacy from the police in the common areas of Tash's apartment. I also agree Smith had a reasonable expectation of privacy in Tash's bathroom. However, the facts presented by this case meet the three-pronged test for application of the community caretaker doctrine articulated in *State v. Lovegren*, 2002 MT 153, ¶ 25, 310 Mont. 358, ¶ 25, 51 P.3d 471, ¶ 25, and *State v. Nelson*, 2004 MT 13, ¶ 7, 319 Mont. 250, ¶ 7, 84 P.3d 25, ¶ 7, and Officer Guiberson was correct in investigating the uncertain condition of the young Ms. Smith.

¶20     All of the information we have concerning this facet of the case comes from the four witnesses who testified at the suppression hearing concerning how Officer Guiberson came to open the bathroom door and find Smith with her head in the toilet. These four are Roslyn Tash, the tenant of the apartment where the party was held, Mary Redlich, with whom Ms. Smith lived, Ms. Smith the Defendant, and Officer Don Guiberson. With the possible exception of Tash's negative response to a question of whether Smith was throwing up while the officers were there, no witness contradicted Guiberson's version of what he was faced with and how he responded. Even then, Tash acknowledged Smith was throwing up earlier in the evening and she snuck into the bathroom to check on Smith shortly before Guiberson opened the bathroom door.

¶21     Officer Guiberson testified:

        Q:      When you went into the apartment, what did you do next?

10

A: When I walked in the apartment, immediately what I did is I looked into, into the rooms, you know, to see, for officer safety purposes, to see who was in there to make sure that we weren't going to, you know, come in contact with something. And what I did is I looked into the living room area . . . and then went down into the bedroom area. . . . I could hear someone throwing up in the bathroom area.

Q: So, that was – And the bathroom's, essentially, is at the end of the hall; is that correct?

A: At the end of the hall is a living room, to the right of that would be the bathroom. The doors are facing opposite directions.

Q: And you said you heard someone throwing up?

A: Yeah.

Q: Would you say that was – Why did that cause you to take further action? Let's say it that way.

A: Well, if someone was sick or someone was in trouble, you know, throwing up, you could hear the heaving and whatnot, so I figured someone was probably in need of some help or something.

Q: Then what you heard was, shall we say, the extreme or perhaps serious–

MS. HOLTON:      Objection, leading.

THE COURT:      Please rephrase your question.

Q: . . . How would you describe the character of the vomiting you heard?

A: It was pretty loud.

Q: And what did you do as a result of that?

A: Well, as a result, I asked someone – and I can't remember who it was – who was in there. And they said it was Rebekah Smith. And as I recall, I don't know if I knocked on the door, but I had said I was coming in at that point.

11

Q: And what did you see when you opened the door? Did you hear anything from inside other than vomiting?

A: No, well, it was kind of heaving vomiting. It was – Someone was extremely sick.

Q: All right. So, you said that you were coming in and then you opened the door.

A: Uh-huh.

Q: And what did you see?

A: I saw Ms. Smith curled up on the floor, hugging the toilet, with her head in the toilet.

Q: Did you check her condition?

A: Yeah.

Q: What was her condition?

A: She was alive, but she was pretty – I felt was pretty intoxicated. I could smell the intoxicating substance and whatnot.

Q: And what did you do with her?

A: At that point, I believe Rossy Tash walked in, was kind of, I don't know, helping her out, so to speak. And then I left right then and went into the other room.

¶22 Examining this scenario with reference to the three factors for application of Montana's community caretaker doctrine in *Lovegren*, and referenced by the Court at ¶ 14, Officer Guiberson was justified in opening the door to the bathroom and checking on Ms. Smith. If he had not done so, and had she suffered any injury from alcohol consumption, he probably would have been sued.

12

¶23    Considering whether the first prong of the community caretaker doctrine was present, was the officer presented with objective, specific, and articulable facts upon which to base a suspicion that a citizen is in need of help or is in peril, Guiberson was presented with the following: (a) he had just come into an apartment rented by an adult with whom he had prior professional contact where there was a loud party in progress and minors were drinking; (b) while he was checking to see that officers were not in danger, he heard loud vomiting in the bathroom; (c) he knew that whoever was in the bathroom was using its facilities for much more than, as the Court delicately phrases it, "the personal and private nature of one's usual activities within a bathroom," ¶ 12; (d) he knew the person in the bathroom was violently sick; (e) because there were people at the party drinking, the cause of the vomiting could well be ingesting too much alcohol; (f) because there were minors at the party who were drinking, he knew the sick person could well be a minor; (g) minors are presumed by law to not have the necessary maturity and judgment to handle their alcohol intake, and thus the sickness could be serious. These facts most certainly raise a suspicion a citizen may be in need of help, or be in peril.

¶24    The officer was more than justified in proceeding to the second, investigative, phase of the community caretaker doctrine; opening the bathroom door. When he did so he observed a fully clothed young girl not sitting on the toilet, but with her head in it, and he was justified in entering to check on her condition. At that point, it became apparent she had been drinking to the point where she was sick. Fortunately, the evidence did not show she was in serious danger from her overindulgence. When it became known that Smith did not

13

need further assistance, Guiberson retreated.  He did not even embarrass Smith by arresting her on the spot, in spite of her condition.

¶25    I must confess I am a bit mystified by the Court's decision Guiberson violated Smith's right to privacy under these circumstances.  One can only hope that some youngster is not injured as a result of the new rule that house party participants should immediately go into the bathroom and close the door when the party is busted, because the cops cannot come in, at least for awhile.

¶26    I dissent.  I would affirm the judgment.

/S/ JOHN WARNER