Robert J. Gladwin, Chief Judge, dissenting. hln this case, the game and fish officers used neutral limitations in their contact with the appellant. Therefore, the ultimate search incident to arrest was constitutionally permissible. I would affirm, thus I respectfully dissent. l2The primary authority cited by appellant in support of his argument is the Fourth Amendment to the United States Constitution, the language of which is mirrored in article 2, section 15, of the Arkansas Constitution, stating: The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. These constitutional guarantees provide fundamental protection to all citizens from unreasonable and arbitrary searches. Furthermore, Arkansas law places restrictions on a law-enforcement officer’s ability to lawfully stop and detain citizens. Ark. R.Crim. P. 3.1 (2014). These long-established and well-recognized legal principles also apply to Arkansas Game and Fish officers. See State v. Allen, 2013 Ark. 35, 425 S.W.3d 753. The question presented is whether AGFC officers are subject to the same legal standards that all other law-enforcement officers are bound to follow before detaining a citizen while engaged in a hunting activity. If so, appellant claims that there is no legal or factual justification for the AGFC officers’ actions in this case, which requires this case to be reversed and appellant’s conditional plea set aside. The circuit court recognized that the United States Supreme Court has held that a random investigative stop of a vehicle is impermissible. See Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (holding that except in situations in which there is at least articu-lable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver’s license and the registration |sof the automobile are unreasonable under the Fourth Amendment). The Court balanced the permissibility of the law-enforcement intrusion on an individual’s Fourth Amendment interest against its promotion of legitimate governmental interest, holding that because of the alternative mechanisms available, including the foremost method of enforcing traffic and vehicle-safety regulations through the observation of violations, the incremental contribution to the governmental interest of highway safety gained from the random spot checks did not justify the practice under the Fourth Amendment. Id.; see also United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). However, the circuit court held that a person who engages in hunting is subject to random stops, checks, and searches by game wardens. The circuit court’s holding acknowledges Justice Blackmun’s concurrence in Prouse, supra, in which he stated: The Court, ante, this page, carefully protects from the reach of its decision other less intrusive spot checks “that do not involve the unconstrained exercise of discretion.” The roadblock stop for all traffic is given as an example. I necessarily assume that the Court’s reservation also includes other not purely random stops (such as every 10th car to pass a given point) that equate with, but are less intrusive than, a 100% roadblock stop. And I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court’s balancing process, and the value factors under consideration, would be quite different. Prouse, 440 U.S. at 663-64, 99 S.Ct. 1391 (Blackmun, J., concurring specially). The majority holds that Prouse and Allen require the court to suppress the evidence because the AGFC officers had no reasonable suspicion to detain and search appellant and that the search was not pursuant to a plan embodying explicit neutral limitations. I agree that the AGFC officers had no reasonable suspicion that a violation had occurred and |4acknowledge that appellant was not free to leave and was thus seized. However, the AGFC officers did have neutral criteria that supports the search. Further, our balancing process weighs in favor of the limited intrusion upon appellant. Prouse and Allen are distinguishable from this case, as both are stop-and-search cases involving vehicles. Hunting is a highly-regulated activity that can be efficiently enforced only with this type of enforcement, above and beyond the admittedly regulated activity of driving an automobile or water craft. The majority holds that controlling precedent requires AGFC officers’ actions to be either (1) based upon reasonable suspicion, or (2) pursuant to a plan embodying explicit neutral limitations. If reasonable suspicion is not required, the second prong must be met. In Allen, the Arkansas Supreme Court stated that, The Fourth Amendment requires that a seizure must be based on specific objective facts indicating society’s legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit neutral limitations on the conduct of the individual officer. 2018 Ark. 35, at 4, 425 S.W.3d at 757 (quoting Brawn v. Texas, 443 U.S. 47, 50, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)). Despite the contention that the State has failed to present any evidence or argument demonstrating that the AGFC officers acted pursuant to such a plan or policy, I disagree that this case poses the same concerns regarding unbridled discretion that mandated the outcome in Allen. As aptly noted by the circuit court in its order denying appellant’s motion to suppress: [Appellant] asserts that the outcome of this case is controlled by the Arkansas Supreme Court’s recent opinion in State v. Allen, which involved a suspicionless stop of a boat for the purpose of conducting a safely check. However, the facts of Allen are distinguishable from the facts of the case at bar. Factually, even though a game and fish officer was involved in the encounter with Mr. Allen, there is no indication in | ¡¡the opinion that Mr. Allen was engaging in the type of fishing activity governed by Arkansas statutes and regulation or that the officer was attempting to conduct an inspection of a fisherman’s catch as was the instance in Colosimo. Rather, in Allen, the officer was attempting to conduct an inspection “for life jackets and other safety items that they [boat owners] are required to have on their vessel.” The court in Allen reached a conclusion based upon an expectation of privacy is involved. The analysis at issue in Allen has specifically been rejected in cases involving the highly regulated activities of hunting and fishing. In Prouse, supra, the United States Supreme Court held that, in those rare instances where the Fourth Amendment allows intrusions absent individualized, ar-ticulable suspicion, law enforcement activities must be undertaken pursuant to specified “neutral criteria” rather than “standardless and unconstrained discretion.” Prouse, 440 U.S. at 661, 99 S.Ct. 1391. The Court, in Prouse, specifically stated that, “given the alternative mechanisms available, both those in use and those that might be adopted,” such as permissible roadblock-style stops, Delaware’s use of standardless, unconstrained individual vehicle stops unconstitutionally permitted officers to base such stops upon their own “unbridled discretion.” Id. Likewise, in Allen, the Arkansas Supreme Court applied the “explicit, neutral limitations” test to a suspicionless stop by finding a Fourth Amendment violation because the game warden relied solely upon his own discretion rather than the type of explicit, neutral limitations required in Prouse. The Arkansas Hunting Guidebook, a copy of which is available to everyone at local sporting-goods stores and online, was presented by the State as evidence of appellant’s reasonable expectation of privacy in the hunting context. The Arkansas Hunting Guidebook clearly states that “it is not legal to” “refuse an officer’s lawful request to inspect your wildlife, tackle, hunting equipment, devices, license, or any item that can reasonably contain wildlife” or “interfere with an officer performing their duties or flee from an officer.” Arkansas Code | (Annotated section 15-43-104 (Repl. 2009) provides that “[a]ll game and fish except fish in private ponds found in the limits of this state are declared to be the property of this state. The hunting, killing, and catching of the game and fish are declared to be privileges.” Section 15-43-105(a) (Repl. 2009) covers related pri-ma facie evidentiary matters and provides: (a) The possession of firearms in fields, forests, along streams, or in any location known to be game cover shall be considered prima facie evidence that the possessor is hunting. These statutes and current rules of the AGFC form the very framework for the “explicit, neutral limitations” test in this case. Appellant’s hunting party was not merely a group of individuals walking around on open public property. Appellant’s shotgun was in plain view resting on a tree, along with two other guns, in a permissible hunting location, during regular duck-hunting season, and within allowed hunting hours, consistent with section 15-43-105(a). Based on that information, the AGFC officers approached appellant’s hunting party and asked to check their identification, licenses, guns, and bags that might contain game. From that minimal amount of information, Officer Aston checked with NCIC to see if appellant had any outstanding warrants, and, at that point, discovered that he was a convicted felon. The methamphetamine and drug paraphernalia were found by Officer Aston in a search incident to appellant’s arrest, pursuant to Arkansas Rule of Criminal Procedure 12.1 (2013), for being a felon in possession of a firearm. State v. Henry, 304 Ark. 339, 802 S.W.2d 448 (1991). Although the United States Supreme Court has not further elaborated on the constitutionality of suspicionless hunting-compliance checks to date, other states that have |7considered the issue overwhelmingly have upheld these checks against constitutional challenges. Several states, specifically Louisiana, Minnesota, and Montana, have concluded that no reasonable expectation of privacy exists in the hunting and fishing context and have given broad powers to game and fish officers to conduct such searches without the limitations of the Fourth Amendment. See State v. Colosimo, 669 N.W.2d 1 (Minn. 2003); State v. Boyer, 308 Mont. 276, 42 P.3d 771 (2002); State v. McHugh, 630 So.2d 1259 (La.1994). In Colosimo, the Minnesota Supreme Court held that, because fishing is a largely recreational privilege that anglers choose to engage in with knowledge of the regulations governing their conduct, an expectation of privacy in all parts of an open boat or other conveyance, admittedly used to transport fish, is not reasonable. See also Boyer, supra (holding that engaging in this highly regulated activity requires anglers to assume the burdens of the sport as well as its benefits, and thus no objectively reasonable expectation of privacy exists when a wildlife-enforcement officer checks for hunting and fishing licenses in open season near game habitat, inquires about game taken, and requests to inspect game in the field.). In Arkansas, like in Minnesota, see Colosimo, supra, and Montana, see Boyer, supra, hunters must assume the burdens of hunting as well as the benefits. Compliance checks such as the one by the AGFC officers in the present case are essential to the AGFC’s stated purpose: The control, management, restoration, conservation and regulation of birds, fish, game, and wildlife resources of the State, including hatcheries, sanctuaries, refuges, reservations and all property now owned or used for said purposes and the acquisition and establishment of same, [and] the administration of the laws now and/or hereafter pertaining thereto[.] |sArk. Const., amend. 35, § 1. And, the authority to “regulate bag limits and the manner of taking game and fish and forbearing animals” and “fix penalties for violations” has been vested in the AGFC by amendment 35, § 8, and is codified at Arkansas Code Annotated § 15-41-203 (Repl. 2009). The highly dangerous and regulated nature of hunting and fishing demands compliance checks, including questioning and checking of hunting and fishing equipment and licenses, even though similar actions might not be reasonable outside the hunting and fishing context. In the alternative, even if hunters enjoy any expectation of privacy at all, then that expectation is greatly diminished. In People v. Maikhio, 51 Cal.4th 1074, 126 Cal.Rptr.3d 74, 253 P.3d 247, 259 (2011), the California Supreme Court held hunting-compliance checks reasonable under balancing tests modified from that used in non-hunting cases like Prouse, supra, and Brignoni-Ponce, supra. The Maikhio court relied on the factors that the United States Supreme Court in New York v. Burger, 482 U.S. 691, 702-03, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), used for special needs and administrative-inspection cases, and applied them in the hunting context: Balancing the importance and strength of the state’s interest and the need for the suspicionless stop and demand procedure against the limited impingement upon privacy resulting from that procedure, we conclude that the Fourth Amendment does not preclude a state from authorizing a game warden to briefly stop a person the warden encounters on a pier, in a boat, or in the field, who the warden reasonably believes has recently been fishing or hunting, to demand that the person display all fish or game that he or she has caught or taken, even in the absence of reasonable suspicion that the person has violated a fish and game statute or regulation. Maikhio, 126 Cal.Rptr.3d 74, 253 P.3d at 262-63. Applying the factors considered in Mai-khio to the hunting-compliance inspection in this case, there is clearly a compelling interest beyond mere law enforcement— the State’s 19control, management, restoration, conservation and regulation of birds, fish, game and wildlife resources — an interest entrusted to the AGFC by amendment 35 to the Arkansas Constitution, property laws, and regulations that recognize the paramount importance of these invaluable natural resources. The Arkansas Constitution perpetuates a public-trust doctrine requiring AGFC to control, manage, restore, conserve, and regulate the wildlife resources of the State. Ark.Code Ann. § 15-43-104; see also Lewis v. State, 110 Ark. 204, 161 S.W. 154 (1913) (holding that the fish and game of the state, ferae naturae, belong to the whole people of the state collectively). Wildlife is owned by the State and not subject to private appropriation except when done under regulations that protect the general interest. See State v. Mallory, 73 Ark. 248, 83 S.W. 955 (1904). AGFC has a special governmental need outside the ordinary law-enforcement context to have its wildlife officers stop hunters and fishers near game and fish habitat, check for hunting and fishing licenses, inquire about game and fish taken, request to inspect game and fish in field possession, and request to inspect killing devices and hunting and fishing tackle. In this capacity, the AGFC officers act not only as law enforcers but also as public trustees protecting, conserving, and promoting conservation of the wildlife of the State by (1) protecting the State’s wildlife resources from those who violate regulations promulgated for the sound management and conservation of the resource and (2) serving as front-line gatherers of information necessary for the intelligent formation and revision of laws, regulations, and policies affecting and regulating seasons, limits, management areas, food chains, and other factors related to the management and conservation of the wildlife. 11flSuch an inspection by an AGFC officer for compliance with AGFC’s regulations involves only a few questions and a brief detention usually of no more than two or three minutes, which is consistent with the AGFC officer’s constitutional and statutory duties and falls far short of being analogous to an arrest. A check for a hunting license, coupled with a question about game, is easily standardized and minimally invasive. The potential interference with the activities of legitimate hunters and fishers is minimal, and the impact on the larger non-hunting and non-fishing segment of the populace is almost nonexistent. The impact in this case consisted of a twenty-minute conversation and inspection of licenses and weapons for compliance with state and federal hunting regulations. It occurred during hunting season on known hunting land and did not involve the stop of a vehicle or vessel. Rather, appellant’s hunting party was approached by foot in the area where they were hunting only after it was confirmed that they were engaged in hunting. Thus, the scope of the encounter was limited only to those practicing the highly-regulated sport of hunting. Finally, as Officer Aston testified, state and federal hunting regulations could not be adequately enforced if he was able to conduct inspections only after developing reasonable suspicion that a violation had occurred. Accordingly, in balancing a hunter’s diminished expectation of privacy with the State’s heightened interest in protecting Arkansas’s wildlife, it is not unreasonable for an AGFC officer to perform a compliance check on someone who is hunting in the absence of reasonable suspicion that the person has violated a game statute or regulation. |1TThe circuit court in this case correctly rejected appellant’s reliance onAllen because the only commonality between that ease and this one is the involvement of an AGFC officer. The officer in Allen did not merely approach Allen to ask some questions, but stopped and boarded his boat for a safety check. There was no indication that Allen was engaged in the practice of hunting or fishing, in which situations state and federal regulations would apply and the need to check for compliance with those regulations would arise. As the court in Allen held, the random stopping and boarding of a boat in that context is analogous to randomly stopping a vehicle without articulable suspicion of illegal activity. A check of someone who is fishing or hunting to inquire about that person’s compliance with state and federal hunting or fishing regulations is not so random. Consequently, Allen is inapposite to this case. If this court looks to other cases, such as Maikhio, that have analyzed the constitutionality of hunting-compliance checks, it is clear that, even assuming, arguendo, that the Fourth Amendment and article 2, section 15, of the Arkansas Constitution are implicated in the sport of hunting, a compliance check does not infringe upon those rights. Walmsley and Glover, JJ., join.