Filed 6/20/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Appellant, | ) | |
| | ) | S180289 |
| v. | ) | |
| | ) | Ct.App. 4/1 D055068 |
| BOUHN MAIKHIO, | ) | |
| | ) | San Diego County |
| Defendant and Respondent. | ) | Super. Ct. No. M031897 |
| _____ | ) | |

To protect and preserve the wildlife of the state for current and future generations, California — like other states — has adopted numerous statutes and regulations governing the conduct of persons who fish or hunt in this state, prescribing, for example, the places where fishing or hunting may occur, the seasons in which particular species may be taken, the number and size of different types of fish or animals that may be caught or shot, the means by which particular types of wildlife may be taken, and the licenses, permits, and records required for different fishing and hunting activities. To make possible the effective enforcement of these regulations, California law has long required anyone who chooses to fish or hunt in this state to exhibit or display, upon demand of any official authorized by California law to enforce the fish and game statutes and regulations (1) any required fishing or hunting license, (2) all fish or game the angler or hunter has caught or taken, and (3) any equipment capable of being used to take such fish or game.

In the present case, a fish and game warden (hereafter game warden), surveilling a public fishing pier from a distance with a spotting telescope, observed defendant Bouhn Maikhio fishing with a handline from the pier and catching either a lobster or fish that defendant placed in a small black bag by his side. Although from his position the game warden could not identify the item defendant had caught and placed in the bag, the warden was aware that, although it was unlawful to do so, such handlines were often utilized in that location to catch spiny lobsters, which were out of season at that time. After the game warden saw defendant leave the pier with the black bag, enter a car in the pier parking lot, and drive away, the warden stopped defendant's car a few blocks from the pier, introduced himself as a game warden, and asked defendant if he had any fish or lobsters in his car. When defendant denied having any, the game warden looked in the car, saw the black bag on the floor of the rear passenger area, opened the bag and discovered a spiny lobster. Upon questioning, defendant admitted taking the lobster and said he had been "stupid" to do so. The game warden issued a citation to defendant and thereafter returned the lobster to the ocean.

When misdemeanor charges were subsequently brought against defendant based upon this incident, defendant filed a motion to suppress the evidence obtained by the game warden on the ground that the warden had engaged in an unconstitutional search and seizure in stopping defendant's car under the circumstances described above. The trial court agreed with defendant's contention, suppressed the evidence, and dismissed the charges. The appellate division of the superior court reversed the trial court's ruling, but the Court of Appeal, after accepting transfer of the appeal, affirmed the trial court's dismissal of the charges in a divided decision. The majority opinion in the Court of Appeal concluded (1) that the game warden was permitted to stop defendant's car only if the warden was aware of facts that provided reasonable suspicion that defendant

2

had violated an applicable statute or regulation, and (2) that the facts in this case did not provide such reasonable suspicion because the game warden was not able to see what item defendant had caught with the handline and defendant could lawfully have used a handline to catch some species of fish other than spiny lobster. The dissenting Court of Appeal justice concluded that the game warden's stop of defendant's vehicle was lawful and was fully supported by California precedent.

On the People's petition, we granted review to determine whether a game warden who reasonably believes that a person has recently been fishing or hunting, but lacks reasonable suspicion that the person has violated an applicable fish or game statute or regulation, may stop a vehicle in which the person is riding to demand the person display all fish or game the person has caught or taken.

For the reasons discussed below, we conclude that the Court of Appeal erred in determining that, under the applicable California statutes and the Fourth Amendment of the United States Constitution, a game warden may make such a vehicle stop only if the warden is aware of facts that give rise to a reasonable suspicion that the angler or hunter has violated a fish and game statute or regulation. As we shall explain, California authority has interpreted the relevant statute as authorizing a stop of a vehicle occupied by an angler or hunter for such purposes, and the United States Supreme Court has held in a number of decisions that an administrative search or seizure may be conducted, consistent with the Fourth Amendment, in the absence of reasonable suspicion that a violation of a statute or administrative regulation has occurred. Such administrative searches and seizures are permissible when (1) the governmental action serves a special and important state need and interest distinct from the state's ordinary interest in enforcing the criminal law, (2) the administrative rules or regulations that are required to achieve the state's interest are of such a nature that limiting inspection

3

only to those persons reasonably suspected of committing a violation would seriously undermine the state's ability to meet its special need, and (3) the impingement upon the reasonable expectation of privacy of those subjected to the procedure is sufficiently limited such that the state's need to utilize the procedure outweighs the invasion which the search entails, thus rendering the procedure reasonable for purposes of the Fourth Amendment.

Applying these principles in the present context, we conclude that (1) the state's interest in protecting and preserving the wildlife of this state for the benefit of current and future generations of California residents and visitors constitutes a special and important state interest and need that is distinct from the state's ordinary interest in crime control, (2) the administrative regulations that are required to serve this interest — involving, for example, limits on the number, size, and species of fish or game that may be taken at different times and in different locations — are of such a nature that they would be impossible to adequately enforce if a game warden could stop, and could demand to be shown all fish or game that have been caught by, only those anglers and hunters who the warden reasonably suspected had violated the fish and game laws, and (3) the impingement upon privacy engendered by such a stop and demand procedure is minimal because (i) the stops are limited to those persons who have voluntarily chosen to engage in the heavily regulated activity of fishing or hunting and as a consequence have a diminished reasonable expectation of privacy with regard to items directly related to such activity, and (ii) the required demands are limited to items directly related to fishing and hunting and do not require disclosure of intimate or confidential matters as to which such persons retain a substantial privacy interest.

Even if we assume that a game warden's stop of a car in which an angler or hunter is riding entails a greater intrusion on privacy than a stop of an angler or

4

hunter who is on foot, we conclude that when, as in this case, the vehicle stop is made reasonably close in time and location to the fishing or hunting activity, the encroachment upon an angler's or hunter's reasonable expectation of privacy resulting from a brief vehicle stop and demand is nonetheless rather modest, and no more intrusive than other actions by game wardens that have been upheld in past California cases.

Weighing (1) the special need of the state to stop persons who choose to fish or hunt in this state and to demand such persons display all fish or game that have been taken against (2) the intrusion upon such persons' reasonable expectation of privacy entailed by such a stop and demand, we conclude that the vehicle stop and demand at issue here constitutes a reasonable procedure under the Fourth Amendment. Accordingly, we reverse the Court of Appeal judgment upholding the suppression of evidence obtained by the game warden and subsequent dismissal of the charges against defendant.

## I. Factual and Procedural Background

### A.

The relevant facts in this case, as disclosed by the evidence introduced at the trial court hearing on defendant's motion to suppress evidence, are undisputed.

Around 11:00 p.m. on a mid-August night in 2007, Erik Fleet, a Department of Fish and Game warden who had been employed by the department for 10 years, was on duty observing fishing activity occurring on the Ocean Beach public pier in San Diego. Warden Fleet was observing surreptitiously, using a spotting telescope mounted on the window of his truck, parked approximately 200 yards from the pier.

Fleet testified that his attention was drawn to defendant because defendant was "fishing on the pier in a method we call handlining, which is commonly used to catch lobsters. It's an illegal method of catching lobsters, but it's very

5

productive and . . . basically a person holds a fishing line in their hand, either the fishing line goes back to their fishing rod and reel or . . . they hold it in their hand and they jerk the fishing line which generally has a treble hook on the bottom of it with the weight on it and squid is usually used for bait. And it gives them a better feel of the bottom because a lobster doesn't strike the bait, it will actually climb onto the bait and they lift the line up when they feel weight on it, they jerk it which causes the hook to penetrate the lobster and they bring it up. It is very common and that's what drew my attention to Defendant."[1]

Fleet testified that defendant was accompanied on the pier by a woman and an infant, and had a black bag next to him. Fleet saw defendant catch something using the handlining method and place the catch into the black bag, but Fleet stated that he was not able to see what had been caught and placed in the bag. (Fleet explained that the spotting telescope generally was powerful enough to distinguish a fish from a lobster, but that the "geographics" of the pier sometimes prevented him from determining what was caught.)

Fleet then observed the two adults and the infant leave the pier, enter the Ocean Beach pier parking lot, and leave the parking lot in their vehicle. Fleet thereafter stopped defendant's vehicle approximately three blocks from the pier. He explained at the hearing that he stopped the vehicle "[b]ecause I had seen him fishing on the pier and I had seen him catch something and . . . put it into that

---

[1] An amicus curiae brief filed by the California Department of Fish and Game explains that "[u]sing hooks to catch lobsters is illegal because they damage the lobsters before they can be brought to the surface and measured to determine whether they meet the minimum size requirements. Lobsters that are undersized, and that have not had an opportunity to reproduce and help maintain a healthy fishery, must be immediately returned to the ocean." Under the applicable regulations, noncommercial anglers may lawfully catch lobsters only by hand or with hoop nets. (Cal. Code Regs., tit. 14, § 29.80, subds. (a), (b).)

6

black bag and therefore I wanted to make sure that . . . he was in compliance with the California fishing law and regulations." When asked whether at that point he suspected that defendant had broken the law, Fleet responded: "Not necessarily, no."

Fleet further testified that after stopping the vehicle, he approached the vehicle in full uniform, introduced himself as a state game warden, and asked defendant if he had any fish or lobsters in his vehicle. Defendant said "[N]o." In light of what he had observed, Fleet believed that defendant was lying, and Fleet then conducted a search of the interior of the vehicle, "discovered the black bag under the female's feet in the left rear passenger [area]," looked in the bag and found a California spiny lobster. Fleet took possession of the lobster. Spiny lobster was out of season at that time and could not lawfully be taken by any method. (Cal. Code Regs., tit. 14, § 29.90.)[2]

Fleet testified that after finding the lobster, because "I was working by myself that evening and since he had the propensity to lie to me, I placed the Defendant in handcuffs for my safety and I sat him on the curb and continued a more detailed search of the vehicle." The further search did not turn up any other fish or lobsters.

Fleet testified that defendant eventually admitted "the lobster was his" and apologized, stating "he was being stupid for doing what he did." Fleet then issued defendant a citation and removed the handcuffs. Defendant signed the citation and

---

**2** Under the applicable regulations, although a person fishing from a public pier is not required to obtain a fishing license, he or she must comply with applicable report card and tagging requirements and with all other applicable fishing regulations. (See, e.g., Cal. Code Regs., tit. 14, §§ 1.74, subd. (c)(2)(B), 29.90-29.91.)

Fleet released him. Fleet further testified that, after releasing defendant, he (Fleet) returned the spiny lobster to the water.

On cross-examination, Fleet acknowledged that "people can use handlining for . . . regular old fishing," that it was not illegal to catch fish by that method at the pier, and that when he saw defendant handlining he did not necessarily think that any law had been broken.

The hearing on the motion to suppress in the present case was conducted at the same time as similar suppression hearings in two other matters, involving different defendants, in which Fleet had obtained evidence of fishing violations utilizing the same basic investigative technique that he used with respect to defendant. At the hearing Fleet testified that his practice of viewing fishing activities from a hidden location using a spotting telescope and thereafter stopping persons who were to be checked after they had departed from their fishing locations in their cars was a general practice and technique that he had been taught in job training at the academy. He explained that the practice was utilized because "if I contact people either in the parking lot while people are entering the pier, new people entering the pier, or if I contact people on the pier, then my . . . 'cover' . . . becomes useless to me. . . . I can't blow my cover on the pier when I'm working the pier. If I go out there, then everybody on the pier knows that Fish and Game is present." He continued: "When I'm working the pier, I work more than one group of people. I can see multiple groups of people violating the law. So, if I go check one group, then the other groups, all the evidence gets thrown, or my cover gets blown." When asked to explain what he meant by "evidence gets thrown," Fleet stated: "[Y]ou can throw evidence off the pier all the time . . . fish, lobsters . . . ." In addition, Fleet noted that another reason for waiting until a person departs from the pier is that "it solidifies possession for me that that person has no intention of releasing whatever they have in their possession, fish or lobsters."

8

**B.**

As a result of the foregoing incident, defendant was charged with two misdemeanors: (1) possessing a spiny lobster during closed season (Cal. Code Regs., tit. 14, § 29.90, subd. (a)), and (2) failing to exhibit his catch upon demand. (Fish & G. Code, § 2012.) The potential penalty for each charge is a fine of not more than $1,000, imprisonment in county jail for not more than six months, or both such a fine and imprisonment. (Fish & G. Code, § 12002.)

Defendant moved to suppress the evidence obtained as a result of Fleet's stop of his vehicle, asserting that such a vehicle stop was impermissible under the Fourth Amendment of the United States Constitution in the absence of evidence giving rise to reasonable suspicion that defendant had committed a criminal offense, and that such evidence was not present here. The prosecution maintained that prior California cases indicated that such a stop by a game warden could be conducted in the absence of reasonable suspicion and that, in any event, the facts here were sufficient to satisfy the reasonable suspicion standard. The trial court disagreed with the prosecution's position on both points, ruling that such a vehicle stop — like ordinary vehicle stops by police officers investigating suspected criminal conduct — could be made only upon reasonable suspicion, and further that the facts at issue here did not support the reasonable suspicion standard. Accordingly, the trial court granted defendant's motion to suppress and subsequently dismissed the charges.

The People appealed the dismissal to the appellate division of the superior court. After briefing and argument, the appellate division reversed the trial court's decision, concluding that the relevant provisions of the Fish and Game Code — sections 1006 and 2012 — authorize a game warden to "stop and detain a person if it is objectively reasonable for the warden to conclude that the person is involved in fishing. The stop must be for the purpose of exercising the authority to conduct

9

an administrative inspection to determine whether the person is in compliance with Fish and Game regulations, that is, to conduct a search of areas listed in Section 1006 and to demand the person . . . exhibit the items listed in Section 2012." The appellate division additionally concluded, as an alternative justification for the stop, that Fleet's observation of defendant's conduct on the pier "provided a basis for an objectively reasonable suspicion that [defendant] had illegally harvested a lobster out of season . . . ."

Thereafter, upon defendant's request, the appellate division certified the appeal for transfer to the Court of Appeal to permit that court to address the important general question whether a California game warden is statutorily authorized to stop a vehicle occupied by a person who the game warden reasonably believes has recently been fishing or hunting but without reasonable suspicion that the person has violated a fish and game statute or regulation, and, if so, whether such a suspicionless stop is unconstitutional under the Fourth Amendment. In response, the Court of Appeal transferred the appeal to itself for hearing and decision, requesting briefing on "(1) whether Fish and Game Code sections 1006 and 2012 authorize vehicle stops without reasonable suspicion of criminal conduct, and (2) whether the warden in this case had reasonable suspicion to believe [defendant] was engaged in illegal lobster fishing."

After briefing and argument, the Court of Appeal, in a two-to-one decision, concluded that Fleet's stop of defendant's vehicle was impermissible. In reaching this conclusion, the majority opinion in the Court of Appeal initially determined that although the relevant provisions of the Fish and Game Code authorize a game warden "to stop people who are fishing on a pier to demand they exhibit their catch and to inspect their receptacles (e.g., tackle boxes, pails, etc.) in which fish may be stored," those provisions do not authorize a game warden to stop a vehicle in which a person who has recently been fishing is riding in order to make a

10

similar demand for the display of any fish that have been caught.  The Court of Appeal additionally concluded that, in any event, Fleet's stop of defendant's vehicle would be permissible under the Fourth Amendment only if the facts known to Fleet provided reasonable suspicion that defendant was involved in criminal activity and that the facts disclosed by the record in this case did not rise to the level of reasonable suspicion.  Accordingly, the Court of Appeal concluded that the trial court properly granted defendant's motion to suppress the evidence obtained by Fleet and it affirmed the trial court's dismissal of the charges against defendant.

One Court of Appeal justice dissented, concluding that "where a game warden has good reason to believe that the occupants of a vehicle have been recently engaged in regulated hunting or fishing," the applicable statutory provisions of the Fish and Game Code authorize the warden to stop the vehicle to inquire if any game has been taken and to demand the display of such game, and further that such a stop of a vehicle for these purposes does not violate the Fourth Amendment whether or not the warden is aware of facts that provide reasonable suspicion that the occupants have violated a fish and game statute or regulation.

On petition by the People, we granted review to consider the validity of the conclusion by the Court of Appeal that a game warden is authorized to stop a vehicle occupied by a person who has been recently fishing or hunting to demand the display of all fish or game that have been caught or taken only if there is reasonable suspicion that the occupant has violated a fish and game statute or regulation.[3]

_____

[3]     In its petition for review, the People sought review limited to the Court of Appeal's conclusion that a vehicle stop by a game warden is permissible only if there is reasonable suspicion that the occupant has committed a violation, and did

*(footnote continued on next page)*

11

**II. Are California Fish and Game Wardens Statutorily Authorized to Stop a Car Occupied by an Angler or Hunter, Without Reasonable Suspicion That the Angler or Hunter Has Violated the Law, to Demand the Display of Any Catch or Game in the Angler's or Hunter's Possession?**

We begin by considering whether the applicable provisions of the Fish and Game Code provided *statutory* authority for Warden Fleet to stop defendant's vehicle under the circumstances presented in this case. As noted, the Court of Appeal concluded that although the applicable statutes authorized Fleet to stop and demand the display of any fish possessed by defendant when defendant was on the pier or in the pier parking lot, the statutes did not authorize Fleet to stop defendant's vehicle a few blocks from the pier to make a similar demand.

Two sections of the Fish and Game Code — sections 1006 and 2012 — are potentially relevant to the issue of statutory authorization.

Fish and Game Code section 1006 provides in pertinent part: "The [Fish and Game] department may inspect the following: [¶] (a) All boats, markets, stores and other buildings, except dwellings, and all receptacles, except the clothing actually worn by a person at the time of inspection, where birds, mammals, fish, reptiles, or amphibia may be stored, placed, or held for sale or storage."

Fish and Game Code section 2012 provides: "All licenses, tags, and the birds, mammals, fish, reptiles, or amphibians taken or otherwise dealt with under

_____

*(footnote continued from previous page)*

not seek review of the appellate court's determination that the facts known to the warden in this case were insufficient to meet the reasonable suspicion standard. Because the People did not seek review of this case-specific issue, we have no occasion to determine whether the Court of Appeal correctly concluded that Fleet lacked reasonable suspicion to stop defendant's vehicle. For purposes of this opinion's discussion, we will simply assume, without deciding, that the facts known to Fleet did not satisfy the reasonable suspicion standard.

12

this code, and any device or apparatus designed to be, and capable of being, used to take birds, mammals, fish, reptiles, or amphibians shall be exhibited upon demand to any person authorized by the department to enforce this code or any law relating to the protection and conservation of birds, mammals, fish, reptiles, or amphibians."[4]

In analyzing whether Fleet's conduct was statutorily authorized, the Court of Appeal placed primary emphasis on the provisions of section 1006. Because that section lists "boats, markets, and stores" but does not list cars or other similar vehicles among the places that the statute specifically authorizes the department to inspect, the Court of Appeal reasoned that the statute did not authorize a game warden to stop or search a vehicle, even if the vehicle was occupied by a person who the warden reasonably believed had recently been fishing. In support of its conclusion, the Court of Appeal relied in part on a 1944 opinion of the California Attorney General concluding that the word "receptacles," as used in the statutory predecessor to section 1006, "cannot be extended to connote motor vehicles" (4 Ops.Cal.Atty.Gen. 405, 407 (1944)), and that the statutory provision in question "confers no authority on the Commission or its officers to inspect or search automobiles." (*Ibid.*)

As we explain, however, we believe the Court of Appeal erred in placing primary reliance upon section 1006 in evaluating the validity of the game warden's action in this case. As the language and history of section 1006 demonstrate, that section is concerned with the authority of game wardens *to inspect or to search* places, premises, or receptacles in which fish or game are stored or placed. Section 1006 is not directed at the distinct question of the

---

**4** Unless otherwise indicated, all further statutory references are to the Fish and Game Code.

13

authority of game wardens *to briefly stop or detain an angler or hunter in order to demand the display of all fish or game he or she may have caught or taken*.[5]  In this case, the initial and key question concerns the authority of Fleet to stop defendant's car in order to demand the display of any fish or lobsters he had caught, and as to that issue it is the provisions of section 2012, rather than the provisions of section 1006, that are most directly on point.[6]

Under the provisions of section 2012, any person who fishes or hunts in this state is required to exhibit, upon demand of any game warden (1) any required fishing or hunting license, (2) all fish or game that have been caught or taken, and (3) any equipment that has been used to take such fish or game.[7]  Although the

---

[5]  Section 1006 is derived from former section 23 of the original Fish and Game Code as enacted in 1933 (Stats. 1933, ch. 73, § 23, p. 396).  Former section 23 provided in relevant part:  "The commission shall inspect *regularly* (1) all boats, markets, stores and other buildings, except dwellings, and all receptacles except the clothing actually worn by a person at the time of inspection, where birds, mammals, fish, mollusks, or crustaceans may be stored, placed, or held for sale or storage . . . ."  (Italics added.)  In providing for the regular inspection of the specified locations, former section 23 was evidently intended to authorize game wardens to conduct repeated inspections of places where fish and game were likely to be kept for sale or storage, and was not primarily directed at more ad hoc, in-the-field stops of noncommercial anglers and hunters by game wardens seeking the display of required licenses or any fish or game that have been caught or taken.

[6]  As we explain below (*post*, at pp. 36-37 & fn. 18), if Fleet's stop of defendant's car and demand for display of any fish or lobsters caught was statutorily authorized and constitutionally permissible, Fleet's subsequent search of defendant's car and the black bag in the car were permissible under the ordinary probable cause standard.  Accordingly, we have no occasion in this case to determine under what circumstances, if any, section 1006 would authorize a game warden to search a "receptacle" that is located within an automobile on less than probable cause.

[7]  Like section 1006, section 2012 is derived from a provision of the original Fish and Game Code as enacted in 1933.  Former section 403 provided:  "All

*(footnote continued on next page)*

14

statutory language does not explicitly so provide, it appears clear that section 2012 implicitly authorizes a game warden to demand that a person who is or has recently been fishing or hunting display to the warden the items to which the statute refers. (See, e.g., *Dickey v. Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 810 ["It is well settled in this state that governmental officials may exercise such . . . powers as are necessary for the due and efficient administration of powers expressly granted by statute, or as *may fairly be implied* from the statute granting the powers"]; *Betchart v. Department of Fish & Game* (1984) 158 Cal.App.3d 1104, 1109-1110 (*Betchart*) [applying foregoing principle in finding game wardens have implied authority to enter private property on which hunting occurs, despite property owner's objection, to enforce hunting regulations].) Nothing in the language or purpose of section 2012 suggests that such a demand may be made by a game warden only to an angler or hunter who the warden reasonably suspects has violated a fish and game statute or regulation, or may be made only when the angler or hunter is on foot or in a boat and not in a vehicle. Given the great expanse of the areas within California in which fishing and hunting take place and the necessarily limited number of game wardens available to enforce the fish and game laws, in our view it is simply not reasonable to interpret the statute as authorizing a game warden to stop an angler or hunter when the angler or hunter is on foot or in a boat but not also to stop an angler or hunter

_____

*(footnote continued from previous page)*

licenses and the birds, mammals, fish, mollusks, or crustaceans taken or otherwise dealt with under the provisions thereof must be exhibited upon demand to any peace officer of this State or to any person authorized to enforce the provisions of this code or any law relating to the protection and conservation of birds, mammals, fish, mollusks, or crustaceans." (Stats. 1933, ch. 73, § 403, p. 435.)

who is travelling in a car during or recently after the fishing or hunting activity, to demand that he or she display the statutorily designated items.

Prior California authority clearly supports an interpretation of section 2012 that authorizes a game warden to stop a vehicle occupied by an angler or hunter to demand the display of the items specified in the statute. The 1944 opinion of the California Attorney General relied upon by the Court of Appeal, for example, drew a clear distinction between the authority of a game warden *to search* an automobile and the authority of a game warden *to stop* an automobile to demand the display of any game taken. The opinion concluded that whereas a game warden was not authorized to search a vehicle without probable cause, the warden could stop a vehicle occupied by persons who the warden reasonably believed to have been hunting and demand that the occupants display any game that had been taken. (4 Ops.Cal.Atty.Gen., *supra*, at p. 409.) Similarly, in *People v. Perez* (1996) 51 Cal.App.4th 1168 (*Perez*), the Court of Appeal upheld the authority of game wardens to stop and briefly detain vehicles occupied by hunters at a fixed highway fish and game checkpoint to demand the display of licenses, game, and hunting equipment. (*Perez, supra,* at p. 1178.) Defendant has not questioned the validity of the decision in *Perez* or the general authority of game wardens to establish fixed fish and game checkpoints on roads or highways, a practice that would be impermissible if game wardens lacked statutory authority to stop a vehicle in which an angler or hunter is riding to demand the display of the items specified in section 2012. (See also *State v. Keehner* (Iowa 1988) 425 N.W.2d 41, 44-45 [interpreting comparable Iowa statute as authorizing a game warden to stop a vehicle to demand the required display when the warden reasonably believes the occupant is engaged in hunting]; *Drane v. State* (Miss. 1986) 493 So.2d 294, 297-298 [interpreting Miss. law as authorizing game wardens to routinely stop vehicles occupied by anglers or hunters to demand display of license or game].)

16

Accordingly, contrary to the determination of the Court of Appeal, we conclude that, reasonably interpreted, section 2012 authorizes a game warden to stop a vehicle whose occupant is or has recently been fishing or hunting to demand the occupant display all fish or game he or she has caught or taken.  Thus, Fleet's stop of defendant's vehicle cannot be faulted on the ground that Fleet lacked statutory authority to undertake such action.

**III.  Does a Fish and Game Warden's Stop of an Angler's Car to Demand the Display of the Angler's Catch, Without Reasonable Suspicion that the Angler Has Violated a Fish and Game Statute or Regulation, Violate the Fourth Amendment?**

Defendant next contends that even if, as we have concluded, a California game warden is statutorily authorized to effect a suspicionless stop of a vehicle occupied by an angler or hunter to demand the display of all fish or game that the occupant has caught or taken, such a stop constitutes an unconstitutional search and seizure because it is made without reasonable suspicion of illegal activity.  For the reasons discussed below, we conclude that the vehicle stop was constitutionally permissible.

Under the current provisions of the California Constitution, evidence sought to be introduced at a criminal trial is subject to suppression as the fruit of an unconstitutional search and seizure "only if exclusion is . . . mandated by the federal exclusionary rule applicable to evidence seized in violation of the Fourth Amendment [of the United States Constitution]."  (*In re Lance W.* (1985) 37 Cal.3d 873, 896.)  Accordingly, we must determine whether the vehicle stop at issue violated the Fourth Amendment of the federal Constitution.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable

17

cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Although it is well established that a brief stop of a vehicle to pose a question to an occupant or to demand the display of a document or other item, like a similar brief stop and inquiry of a pedestrian, constitutes a "seizure" for purposes of the Fourth Amendment (see, e.g., *Delaware v. Prouse* (1979) 440 U.S. 648, 653 (*Prouse*) [vehicle stop]; *United States v. Brignoni-Ponce* (1975) 422 U.S. 873, 878 (*Brignoni-Ponce*) [vehicle stop]; *Brown v. Texas* (1979) 443 U.S. 47, 52 [pedestrian stop]; *Terry v. Ohio* (1968) 392 U.S. 1, 16 [pedestrian stop]), it is equally well settled that because the intrusion upon privacy occasioned by such a brief stop is much less significant than the intrusion resulting from an arrest or other extended detention of an individual, the ordinary probable cause and warrant requirements of the Fourth Amendment applicable to arrests or similar full-scale seizures of a person do not apply to such brief vehicle or pedestrian stops or detentions. (See, e.g., *Brignoni-Ponce*, *supra*, at pp. 881-884; *Brown v. Texas*, *supra*, at pp. 50-51.) Instead, the constitutional validity of such a stop turns upon the reasonableness of the procedure, taking into account " 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.' " (*Illinois v. Lidster* (2004) 540 U.S. 419, 427; cf. *Camara v. Municipal Court* (1967) 387 U.S. 523, 536-537 ["[T]here can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails"].)

To date, the United States Supreme Court has not directly addressed the question of the constitutional validity of a brief stop of an angler or hunter by a game warden to demand the display of any fish or game in the angler's or hunter's possession, either when the angler or hunter is on foot or is in a vehicle. Both defendant and the People maintain, however, that decisions of the United States

18

Supreme Court arising in other contexts provide guidance as to the controlling Fourth Amendment principles and each party argues that the prior decisions support its own position regarding the asserted invalidity or validity of the vehicle stop at issue here.

Defendant contends that the most relevant Supreme Court decisions are those that, in other contexts, have upheld the constitutional validity of suspicionless stops of cars *at fixed highway checkpoints* but at the same time have concluded that suspicionless *"roving"* stops of cars are constitutionally impermissible and that such roving stops may be made only upon reasonable suspicion. (Compare *Michigan Dept. of State Police v. Sitz* (1990) 496 U.S. 444 (*Sitz*) [upholding suspicionless stop of vehicles at a fixed sobriety checkpoint] and *United States v. Martinez-Fuerte* (1976) 428 U.S. 543 [upholding suspicionless stop of vehicles at fixed border patrol checkpoint] with *Prouse*, *supra*, 440 U.S. 648 [invalidating suspicionless roving stop of vehicle to check for driver's license] and *Brignoni-Ponce*, *supra*, 422 U.S. 873 [holding that roving stop of vehicle by border patrol to check for undocumented aliens requires reasonable suspicion].) Defendant argues that because the only prior California decision upholding the constitutional validity of a suspicionless fish and game stop of a vehicle involved a fixed highway checkpoint (see *Perez*, *supra*, 51 Cal.App.4th 1168) and because a roving stop involves a greater intrusion on privacy and less constraint upon a game warden's discretion than a fixed checkpoint (see, e.g., *Prouse*, *supra*, at p. 657), the *Perez* decision does not support the validity of the game warden's roving stop of his car in the present case.

In response, the People point out that in *Prouse*, *supra*, 440 U.S. 648 — one of the seminal high court decisions finding roving suspicionless automobile stops impermissible — Justice Blackmun authored a concurring opinion (joined by Justice Powell) expressly cautioning that the rationale of the majority opinion in

19

*Prouse* would not necessarily apply to suspicionless vehicle stops by game wardens. (See *Prouse, supra,* at p. 664 (conc. opn. of Blackmun, J.) ["I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court's balancing process, and the value factors under consideration, would be quite different"].) The People note that Justice Blackmun's comment in *Prouse* is the only statement relating to fish and game stops to appear in a Supreme Court decision to date. They contend that in the fish and game context the factors upon which the high court relied in *Prouse* — particularly the practical need for and likely efficacy of suspicionless vehicle stops to serve the state interest at issue — support the conclusion that stopping anglers or hunters in vehicles to demand that they display any fish or game they have caught or taken, even without reasonable suspicion of illegal activity, is reasonable under the Fourth Amendment.

The People further contend that the constitutional validity of a suspicionless stop of an angler's or hunter's vehicle by a game warden to demand the display of any fish or game that has been caught or taken is supported by a separate line of Supreme Court cases that, in a variety of contexts, have upheld regulatory or administrative searches or seizures conducted without reasonable suspicion that the individual or business subjected to the procedure has violated a statute or regulation. (See, e.g., *United States v. Biswell* (1972) 406 U.S. 311 (*Biswell*) [upholding suspicionless inspection of documents and records of licensed firearm dealer]; *Donovan v. Dewey* (1981) 452 U.S. 594 (*Donovan*) [upholding suspicionless inspection of underground and surface mines]; *New York v. Burger* (1987) 482 U.S. 691 (*Burger*) [upholding suspicionless inspection of auto junkyard]; *Skinner v. Railway Labor Executives' Assn.* (1989) 489 U.S. 602

20

(*Skinner*) [upholding suspicionless blood and urine testing of railroad employees involved in major railroad accidents]; *Treasury Employees v. Von Raab* (1989) 489 U.S. 656 (*Von Raab*) [upholding suspicionless drug testing of customs service employees seeking positions involving the interdiction of drugs or requiring the carrying of firearms]; *Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646 (*Vernonia*) [upholding suspicionless drug testing of school athletes]; see also *City of Indianapolis v. Edmond* (2000) 531 U.S. 32, 37-38 (*Edmond*) [describing instances in which suspicionless searches or seizures have been found constitutionally permissible].)

The foregoing cases have generally involved circumstances in which (1) the state has "special needs," beyond its ordinary interest in the enforcement of criminal statutes, to conduct inspections (see, e.g., *Vernonia*, *supra*, 515 U.S. at pp. 652-653; *Griffin v. Wisconsin* (1987) 483 U.S. 868, 873; *New Jersey v. T.L.O.* (1985) 469 U.S. 325, 351 (conc. opn. of Blackmun, J.)); (2) the regulations in the particular area could not be effectively enforced if public officials could conduct inspections only when the officials have a reasonable suspicion that a violation has occurred (see, e.g., *Donovan*, *supra*, 452 U.S. at pp. 602-603; *Burger*, *supra*, 482 U.S. at p. 710); and (3) the persons or businesses subjected to the inspection are engaged in a particular category of activity that reduces the reasonable expectation of privacy of those engaged in such activities in relation to the searches or seizures at issue, and the discretion of inspecting officials is reasonably constrained by the authorizing statute or regulation (see, e.g., *Vernonia*, *supra*, at p. 657; *Skinner*, *supra*, 489 U.S. at p. 627; *Biswell*, *supra*, 406 U.S. at p. 316).

In our view, the aforementioned factors to which the high court has looked in its special needs and administrative inspection cases are the appropriate factors to be considered in determining the reasonableness, for purposes of the Fourth Amendment, of the fish and game procedure at issue here. As we explain below,

21

the state interest underlying a stop and demand pursuant to section 2012 is quite distinct from the state's ordinary interest in the enforcement of its criminal law, and the limited category of persons affected by the procedure — anglers and hunters — are individuals who have chosen to engage in a heavily regulated activity that reduces their reasonable expectation of privacy with regard to the type of intrusion at issue.[8]  Accordingly, we conclude that the analysis undertaken by the United States Supreme Court in the above line of cases is warranted in this case as well.

Furthermore, in evaluating the factors considered in the special needs and administrative inspection cases, we believe it is useful to begin by considering whether, under the Fourth Amendment, it is reasonable for a game warden to stop an angler or hunter *who is not in a vehicle — that is, an angler or hunter who is on*

---

[8]     In defending the stop in this case, the People — in addition to relying upon the special needs and administrative inspection cases — argue that, in light of the heavily regulated nature of fishing and hunting, persons who choose to fish or hunt in this state have impliedly consented to be stopped by game wardens and to display their catch or take upon demand, and thus may not properly challenge the stop and demand procedure.  Although the United States Supreme Court has at times relied upon the "implied consent" theory (see, e.g., *Almeida-Sanchez v. United States* (1973) 413 U.S. 266, 271 [describing basis of administrative inspection decisions]; *Marshall v. Barlow's, Inc.* (1978) 436 U.S. 307, 313-314 [same]), that theory has drawn substantial scholarly criticism (see, e.g., 4 LaFave, Search and Seizure (4th ed. 2004) § 8.2(*l*), pp. 122-124; 5 LaFave, Search and Seizure, *supra*, § 10.2(c), pp. 48-53).  The high court's more recent decisions have usually described the effect of heavy or close regulation of a business or activity (or the special nature of the activity engaged in by the person subjected to the challenged procedure) as diminishing an individual's or business's reasonable expectation of privacy (see, e.g., *Donovan*, *supra*, 452 U.S. at pp. 598-599, 603-604; *Burger*, *supra*, 482 U.S. at pp. 701-702; *Skinner*, *supra*, 489 U.S. at pp. 627-628; *Von Raab*, *supra*, 489 U.S. at p. 672; *Vernonia*, *supra*, 515 U.S. at pp. 654-657) rather than by reference to implied consent.  Following the Supreme Court's current approach, we consider the effect of the state's close regulation of fishing and hunting upon an angler's or hunter's reasonable expectation of privacy.

22

*a pier, in a boat, or in the field* — to demand that he or she display any fish or game taken, without reasonable suspicion that the angler or hunter has violated a fish and game statute or regulation. Thereafter, we consider whether even if such a stop of an angler or hunter who is not in a vehicle is constitutionally permissible, a suspicionless stop of *a vehicle occupied by an angler or hunter who is or has recently been fishing or hunting* is or is not constitutionally permissible.

As noted above, the relevant cases have first considered the nature and strength of the state interest or need that is sought to be served by the procedure at issue, and whether that interest is distinct from the state's ordinary interest in enforcing its criminal law. Here, the state interest at issue is the state's interest in protecting and preserving the fish and game resources of the state for the benefit of all of the public and for future generations. The legitimacy and importance of this state interest are reflected in a number of provisions embodied in the California Constitution (Cal. Const., art. I, § 25; *id.,* art. IV, § 20; *id*., art. X B, §§ 1-16),[9] in

_____

[9]     Article I, section 25, was adopted in 1910 " 'to preserve to the people the right to fish upon the public lands of the state, and to require that grants of land by the state should not be made "without reserving to the people the absolute right to fish thereon." ' " (*Paladini v. Superior Court* (1918) 178 Cal. 369, 372, quoting Cal. Const., art. I, § 25.) At the same time, the section explicitly recognizes the Legislature's authority to regulate "the season when and the conditions under which the different species of fish may be taken" (Cal. Const., art. I, § 25), reaffirming the broad legislative discretion, set forth in prior judicial decisions, to protect the fish of the state for the public generally and for future generations. (*Paladini v. Superior Court*, *supra*, at pp. 371-372.)

    Article IV, section 20, authorizes the Legislature to divide the state into "fish and game districts" and to "protect fish and game" in such districts, and additionally establishes the Fish and Game Commission.

    Article X B embodies the Marine Resources Protection Act of 1990, limiting the use of gill and trammel nets.

numerous statutory provisions (e.g., Fish & G. Code, §§ 1700, 1801),[10] and in many judicial decisions rendered throughout our state's history. (See, e.g., *Ex parte Maier* (1894) 103 Cal. 476, 479-484; *Ex parte Kenneke* (1902) 136 Cal. 527, 528-530; *In re Phoedovius* (1918) 177 Cal. 238, 241-244.) Past cases have described the state interest in preserving and managing its natural resources, including its wildlife, as great and compelling (see, e.g., *Perez*, *supra*, 51 Cal.App.4th at p. 1175; *Betchart*, *supra*, 158 Cal.App.3d at p. 1110), and have stressed that the state has an obligation and duty to exercise supervision over such resources for the benefit of the public generally. (See, e.g., *People v. Harbor Hut Restaurant* (1983) 147 Cal.App.3d 1151, 1154 (*Harbor Hut*).) Although many of the prior California decisions, drawing upon the common law, speak of the state's "title" or "ownership" of the wild fish and animals within its borders (see, e.g., *Ex parte Maier*, *supra*, at p. 483; *Perez*, *supra*, at p. 1175) — a characterization that a number of United States Supreme Court decisions have described as a legal fiction (see, e.g., *Toomer v. Witsell* (1948) 334 U.S. 385, 402; *Douglas v. Seacoast*

---

[10] Section 1700 provides in relevant part: "It is hereby declared to be the policy of the state to encourage the conservation, maintenance, and utilization of the living resources of the ocean and other waters under the jurisdiction and influence of the state for the benefit of all citizens of the state . . . . This policy shall include . . . : [¶] (a) The maintenance of sufficient populations of all species of aquatic organisms to insure their continued existence. . . ."

Section 1801 provides in relevant part: "It is hereby declared to be the policy of the state to encourage the preservation, conservation, and maintenance of wildlife resources under the jurisdiction and influence of the state. This policy shall include the following objectives: [¶] (a) To maintain sufficient populations of all species of wildlife and habitat necessary to achieve the objectives stated in subdivisions (b), (c), and (d). [¶] (b) To provide for the beneficial use and enjoyment of wildlife by all citizens of the state. [¶] (c) To perpetuate all species of wildlife for their intrinsic and ecological values, as well as for their direct benefits to all persons. [¶] (d) To provide for aesthetic, educational, and nonappropriative uses of the various wildlife species."

24

*Products, Inc.* (1977) 431 U.S. 265, 284; *Hughes v. Oklahoma* (1979) 441 U.S. 322, 331-336; cf. *People v. Brady* (1991) 234 Cal.App.3d 954, 961) — all of the pertinent decisions, including all of the federal decisions that have addressed the state ownership of wildlife language, confirm the legitimate and, indeed, vital nature of a state's interest in protecting its natural resources, including the wildlife within the state, from depletion and potential unavailability for future generations. (See, e.g., *Toomer*, *supra*, at p. 402; *Douglas*, *supra*, at p. 284; *Hughes*, *supra*, at pp. 335-336; *Baldwin v. Montana Fish & Game Comm'n* (1978) 436 U.S. 371, 386-387, 389-391; *Brady*, *supra*, at p. 961.) This state interest is quite distinct from the state's ordinary interest in crime control, and in this respect is comparable to the types of state interests involved in the high court's special needs cases.

Second, many of the regulations that are required to further the state's interest in preserving species of fish and game for the current and future generations concern, for example, the specific species, number and size of fish or animals that may be caught or taken.[11] A rule permitting a game warden to stop and to demand display of only those anglers or hunters who the warden reasonably suspects have violated a statute or regulation would seriously compromise, if not completely undermine, the state's ability to accomplish its objective. Violations of these types of regulations are not readily apparent from an angler's or hunter's outward appearance or conduct, and realistically can be detected only if a game

---

[11] During the suppression hearing, Fleet explained: "All of the size regulations are geared around the reproductive cycles of these fish and . . . it gives the fish enough time to produce and spawn several seasons prior to being taken from the wild. That's what the regulations are for, it's to keep the resource stocked."

warden is able to stop and demand the required disclosure of any person who the warden reasonably believes is or has recently been fishing or hunting.

*Prouse*, *supra*, 440 U.S. 648, held that a roving suspicionless stop of a vehicle to check if the driver possessed a valid driver's license was not a reasonable seizure for purposes of the Fourth Amendment. In reaching this conclusion, the United States Supreme Court relied heavily upon its determination that (1) the state interest in ensuring that those persons driving on its roads and highways have a valid driver's license was adequately and much more effectively served by stopping vehicles that commit traffic violations and checking the stopped drivers for valid licenses and registration than by choosing randomly to stop vehicles from the entire universe of drivers to check for driver's licenses, and (2) that an unlicensed driver would be as readily deterred by the likelihood of being involved in an accident or stopped for a traffic violation as by the chance of being randomly stopped for a spot check. (*Prouse, supra,* at pp. 659-660.)[12] In

---

[12] In *Prouse*, *supra,* 440 U.S. 648, the court stated in this regard: "The foremost method of enforcing traffic and vehicle safety regulations, it must be recalled, is acting upon observed violations. Vehicle stops for traffic violations occur countless times each day; and on these occasions, licenses and registration papers are subject to inspection and drivers without them will be ascertained. Furthermore, drivers without licenses are presumably the less safe drivers whose propensities may well exhibit themselves. Absent some empirical data to the contrary, it must be assumed that finding an unlicensed driver among those who commit traffic violations is a much more likely event than finding an unlicensed driver by choosing randomly from the entire universe of drivers. If this were not so, licensing of drivers would hardly be an effective means of promoting roadway safety. It seems common sense that the percentage of all drivers on the road who are driving without a license is very small and that the number of licensed drivers who will be stopped in order to find one unlicensed operator will be large indeed. The contribution to highway safety made by discretionary stops selected from among drivers generally will therefore be marginal at best. Furthermore, and again absent something more than mere assertion to the contrary, we find it difficult to believe that the unlicensed driver would not be deterred by the

*(footnote continued on next page)*

26

the fish and game context, by contrast, there is no comparable alternative that provides an effective means of enforcing the fish and game regulations, and anglers and hunters are not likely to be deterred from complying with the numerous, difficult-to-detect regulations in the absence of a requirement that they display all fish or game caught or taken upon demand of any game warden. (See, e.g., *Mollica v. Volker* (2d Cir. 2000) 229 F.3d 366, 372 [" 'It would be impossible for environmental conservation officers to perform their regulatory functions without stopping hunters as they leave known public hunting areas. . . . [I]t is impossible to determine whether game is properly tagged until after the hunter ha[s] secured the game and ha[s] departed the area.' [The conservation officer], furthermore, could not have proceeded by attempting to spot drivers whose particular characteristics gave rise to a reasonable suspicion. Unlike driving under the influence of alcohol, the possession of improperly tagged deer cannot be readily identified by the manner of driving, or other features ascertainable without stopping a motor vehicle"].)

_____

*(footnote continued from previous page)*

possibility of being involved in a traffic violation or having some other experience calling for proof of his entitlement to drive but that he would be deterred by the possibility that he would be one of those chosen for a spot check. In terms of actually discovering unlicensed drivers or deterring them from driving, the spot check does not appear sufficiently productive to qualify as a reasonable law enforcement practice under the Fourth Amendment." (*Id.* at pp. 659-660, fn. omitted; see also *Brignoni-Ponce*, *supra*, 422 U.S. at p. 883 ["[t]he nature of illegal alien traffic and the characteristics of smuggling operations tend to generate articulable grounds for identifying violators. Consequently, a requirement of reasonable suspicion for stops allows the Government adequate means of guarding the public interest and also protects residents of the border areas from indiscriminate official interference"].)

Third, for a number of reasons, we conclude that the intrusion upon privacy engendered by a game warden's stop of an angler or hunter to demand the display of his or her catch or take is relatively minor. To begin with, the stops are limited to persons who a game warden reasonably believes are or have recently been fishing or hunting — persons who have voluntarily chosen to engage in an activity that is heavily regulated in order to assure the continued existence of the wildlife of this state for the benefit not only of future generations but for the benefit of current anglers and hunters themselves. In light of the number and nature of the regulations that apply to fishing and hunting[13] and the type of enforcement procedures that are necessary to enforce such regulations, anglers and hunters have a reduced reasonable expectation of privacy when engaged in such activity.[14] (See, e.g., *Perez*, *supra*, 51 Cal.App.4th at p. 1178; *Mollica v. Volker*, *supra*, 229 F.3d at p. 372.) In addition, the intrusion upon privacy occasioned by such a stop and demand is further diminished because the required display is limited to items directly related to the person's fishing or hunting activity and does not require the disclosure of unrelated possessions in which the angler or hunter reasonably retains a substantial privacy interest. Finally, because section 2012 strictly limits the items that a game warden may demand be displayed, the statute significantly constrains a game warden's discretion in a manner that closely comports with the

---

[13] The Department of Fish and Game has published an 88-page booklet setting forth the regulations applicable to ocean sport fishing in California. (Cal. Dept. Fish & Game, Cal. Ocean Sport Fishing Regulations (2010-2011).)

[14] Contrary to defendant's contention, numerous cases establish that the existence of pervasive regulation can diminish the reasonable expectation of individuals as well as businesses. (See, e.g., *Skinner*, *supra*, 489 U.S. 602, 627-628 [railroad workers]; *Von Raab*, *supra*, 489 U.S. at p. 672 [customs service employees]; *Vernonia*, *supra*, 515 U.S. at p. 657 [school athletes]; *Shoemaker v. Handel* (3d Cir. 1986) 795 F.2d 1136 [racehorse jockeys].)

state interest in question. (Cf., e.g., *Brignoni-Ponce*, *supra*, 422 U.S. at pp. 881-882 ["The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain any suspicious circumstances, but any further detention or search must be based on consent or probable cause"]; *Burger*, *supra*, 482 U.S. at pp. 711-712 ["the permissible scope of these searches is narrowly defined: the inspectors may examine the records, as well as 'any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises' "].)

Balancing the importance and strength of the state's interest and need for the suspicionless stop and demand procedure against the limited impingement upon privacy resulting from that procedure, we conclude that the Fourth Amendment does not preclude a state from authorizing a game warden to briefly stop a person the warden encounters on a pier, in a boat, or in the field, who the warden reasonably believes has recently been fishing or hunting, to demand that the person display all fish or game that he or she has caught or taken, even in the absence of reasonable suspicion that the person has violated a fish and game statute or regulation. Indeed, both the Court of Appeal and defendant appear to concede this point, because both acknowledge that, even in the absence of reasonable suspicion, in this case Fleet could have stopped defendant and demanded display of any fish or lobsters in his possession had Fleet confronted defendant while defendant was on the pier or in the pier parking lot, rather than in his car.

Defendant argues and the Court of Appeal concluded, however, that a different constitutional result is compelled here because Fleet stopped defendant to demand the display of his catch while defendant was in a car rather than on the pier or in the pier parking lot. Even if we assume that the stop of a car on a public street or highway involves a greater intrusion on privacy than the stop of an

29

individual when the individual is on foot, when the vehicle stop is made by a game warden reasonably close in time and location to an individual's fishing or hunting activity, the impingement upon the individual's reasonable expectation of privacy is quite modest, and no more intrusive than the actions of game wardens that have been upheld in prior California decisions. (See, e.g., *Betchart*, *supra*, 158 Cal.App.3d 1104 [game warden's entry onto private property, over owner's objection, to enforce hunting regulations]; *Harbor Hut*, *supra*, 147 Cal.App.3d 1151 [game warden's inspection of wholesale fish market's records and stock].)

In light of the importance of the state interest served by such a stop, and the practical need to be able to make such a stop and demand even when there is not reasonable suspicion that an angler or hunter has violated a statute or regulation, we conclude that when a game warden reasonably believes that an occupant of a vehicle has recently been fishing or hunting, the warden does not violate the Fourth Amendment by stopping the vehicle to demand the display of all fish or game that have been taken.

We note that the great majority of out-of-state decisions that have addressed the question of the validity of suspicionless stops of anglers and hunters by game wardens have found such stops constitutionally permissible. Although many of the cases have involved fixed highway checkpoints (see, e.g., *U.S. v. Fraire* (9th Cir. 2009) 575 F.3d 929; *State v. Sherburne* (Me. 1990) 571 A.2d 1181; *Drane v. State*, *supra*, 493 So.2d 294 [Miss.]; *State v. Albaugh* (N.D. 1997) 571 N.W.2d 345; *State v. Tourtillott* (Or. 1980) 618 P.2d 423; *State v. Halverson* (S.D. 1979) 277 N.W.2d 723), a substantial number have upheld roving suspicionless stops of persons a game warden reasonably believes have been fishing or hunting. (See, e.g., *Elzey v. State* (Ga.Ct.App. 1999) 519 S.E.2d 751; *People v. Layton* (Ill. App. Ct. 1990) 552 N.E.2d 1280; *State v. Keehner*, *supra*, 425 N.W.2d 41 [Iowa]; *State*

*v. Colosimo* (Minn. 2003) 669 N.W.2d 1; *State v. Boyer* (Mont. 2002) 42 P.3d 771.)

Most of the out-of-state decisions that have found roving suspicionless fish and game stops unconstitutional have involved instances in which the stops were not confined to persons the game warden had reason to believe had recently been fishing or hunting (see, e.g., *United States v. Munoz* (9th Cir. 1983) 701 F.2d 1293, 1295-1301; *People v. Coca* (Colo. 1992) 829 P.2d 385, 387; *State v. Creech* (N.M.Ct.App. 1991) 806 P.2d 1080, 1084; *State v. Legg* (W.Va. 2000) 536 S.E.2d 110, 112) or went beyond the bounds of a reasonable fish and game inspection (see, e.g., *State v. Medley* (Idaho 1995) 898 P.2d 1093; *State v. Baldwin* (N.H. 1984) 475 A.2d 522, 526-527). We are aware of one out-of-state case in which an appellate court stated in dictum that although a game warden may conduct a roving stop of an angler or hunter who is not in a vehicle without reasonable suspicion, a roving stop of a vehicle occupied by an angler or hunter may be conducted only upon reasonable suspicion. (*People v. Levens* (Ill. App. Ct. 1999) 713 N.E.2d 1275, 1277.) (The statement in question was dictum because in *Levens* itself the court upheld the validity of the stop at issue in that case, finding that the game warden who made the stop reasonably believed the defendant was engaged in illegal hunting from his car.) In stating that reasonable suspicion was required for such a vehicle stop, however, the court in *Levens* did not analyze the various factors discussed in the special needs and administrative inspection cases, and in particular failed to consider the practical effect of a reasonable suspicion requirement upon the state's general ability to enforce its fish and game regulations. For this reason, we do not find the dictum in *Levens* persuasive.

31

**IV. Even If Suspicionless Fish and Game Vehicle Stops of Anglers or Hunters Are Generally Constitutional, Did the Particular Circumstances of the Vehicle Stop in This Case Render the Stop Unconstitutional?**

Defendant further contends that even if the Fourth Amendment does not, as a general matter, prohibit a roving suspicionless stop of a vehicle occupied by an angler or hunter to demand the display of all fish or game that have been caught or taken, the stop of defendant's car was nonetheless unlawful for a variety of reasons arising from the particular facts of the present case. For the reasons discussed below, we conclude that this additional claim lacks merit.

Defendant first asserts that although the stop in this case was conducted by a game warden rather than an ordinary police officer, the technique utilized by the warden — stopping vehicles leaving the pier only when the warden subjectively believed that an occupant might have violated the law — demonstrates that the warden's primary motivation for the stop was crime detection, rather than the protection of the state's fish and game, and for that reason the stop was unconstitutional. (Cf., e.g., *Edmond*, *supra*, 531 U.S. 32 [fixed highway checkpoint established to detect and interdict illegal drugs was unconstitutional because its purpose was ordinary crime control]; *Ferguson v. Charleston* (2001) 532 U.S. 67 [hospital's special procedure of drug testing pregnant patients was unconstitutional because the police department's involvement in the procedure's drafting and administration demonstrated that the procedure's objective was to obtain evidence to facilitate the threat of criminal prosecution].) Although the Court of Appeal agreed with this assertion, in our view it is not well founded. The controlling United States Supreme Court decisions explain that in determining whether the purpose of a challenged procedure is ordinary crime detection or some other objective, the appropriate focus is upon the *programmatic purpose* of the procedure, not the motivations of the individual officer. (See, e.g., *Edmond*, *supra*, at pp. 45-47; *Ferguson*, *supra*, at p. 81.) As the high court's administrative

32

inspection cases establish, the circumstance that a violation of an administrative regulation may be prosecuted as a crime does not mean that an administrative stop or inspection procedure is primarily intended as an ordinary crime control measure, rather than to serve a distinct interest other than the enforcement of the criminal law. (See, e.g., *Burger*, *supra*, 482 U.S. at pp. 712-713; *Biswell*, *supra*, 406 U.S. at pp. 314-316.) In our view, it is clear that the primary programmatic purpose of section 2012's requirement that anglers and hunters display all fish or game that have been caught or taken upon demand of any game warden is to protect and preserve the wildlife of the state, rather than to further the state's interest in ordinary crime control. (See, e.g., *U.S. v. Fraire*, *supra*, 575 F.3d at pp. 932-933 [game checkpoint was not a general crime control device even though hunting violations could subject violator to criminal prosecution].) Moreover, even if it were appropriate to consider the individual motivation of Warden Fleet, it appears clear that his actions were directed at protecting the state's wildlife. As we have seen, the record establishes that Fleet not only cited defendant for violating the fish and game statutes and regulations, but also that he returned the improperly taken lobster to the ocean, an action that clearly furthered the state's interest in protecting and preserving the state's wildlife.[15]

Defendant next contends that in order to establish that the particular seizure was reasonable for purposes of the Fourth Amendment, the prosecution was required to establish that the specific investigative method employed here — that is, the surreptitious observation of persons fishing on the pier and the subsequent

---

[15]     As noted above (*ante*, at p. 8), in this case the hearing on defendant's motion to suppress evidence was conducted at the same time as suppression hearings in two other cases in which Fleet made similar vehicle stops of anglers on two other occasions. In each instance, in addition to citing the anglers, Fleet returned all unlawfully caught fish or lobsters to the ocean.

33

stopping of individuals to demand the display of their catch only after they entered their vehicles and left the pier parking lot — was necessary and more effective than alternative enforcement procedures, such as establishing a fixed checkpoint at the exit of the pier parking lot or having a fish and game officer demand such display from anglers while they are still on the pier.  Past cases, however, do not support the suggestion that a state is obligated to utilize the least restrictive alternative in establishing such administrative procedures in order to satisfy the Fourth Amendment reasonableness standard, but rather explain that a state has considerable leeway in choosing between alternative enforcement methods.  (See, e.g., *Sitz, supra*, 496 U.S. at pp. 453-454 ["[F]or purposes of Fourth Amendment analysis, the choice among . . . reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers"]; *United States v. Sokolow* (1989) 490 U.S. 1, 11 ["The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques"].)

Here, although the game warden's observation of defendant was surreptitious, the activity of defendant that was observed occurred in a public place and was not of an intimate or private nature.  Past California decisions have upheld a game warden's use of a spotting telescope in this fashion to enforce the applicable fish and game regulations.  (See, e.g., *People v. Tatman* (1993) 20 Cal.App.4th 1, 6; *People v. Nguyen* (1984) 161 Cal.App.3d 687, 690-691.)  In view of the great geographic expanse and the significant number of locations at which fishing and hunting occur in California and the limited number of game

wardens available to enforce the fish and game laws throughout the state,[16] we conclude that the administrative practice of utilizing covert observation — a practice that promotes self-policing by anglers and hunters — constitutes a reasonable means of enforcing the applicable fish and game statutes and regulations. (Cf. *Harbor Hut*, *supra*, 147 Cal.App.3d at p. 1156 ["[A] wholesale fish dealer's knowledge that his records and stock can, without warning, be examined is an effective means of ensuring compliance with the applicable laws and regulations"].)

Finally, defendant argues that the intrusion on privacy resulting from the vehicle stop in this case was greater than the intrusions incurred in fish and game stops in other cases because the stop here occurred at night in an urban area, a setting in which a vehicle driver or occupant might well be apprehensive about being stopped and directed to pull over by someone who might turn out not to be an actual law enforcement officer. But it was defendant, of course, who chose to fish at night on the pier in question, and because the vehicle stop was made in close proximity to the pier by a uniformed game warden, we conclude that the intrusion upon defendant's privacy resulting from the stop was not so significant as to outweigh the justification for the stop.

Accordingly, we conclude that Fleet did not violate the Fourth Amendment in stopping defendant's vehicle and demanding defendant display any fish or lobsters he had caught.

---

[16] According to the most recent state publication on state employment, the Fish and Game Department employs approximately 300 game wardens in its law enforcement division. (See Cal. Dept. of Fin., Salaries & Wages (2010-2011) Natural Resources, pp. RES 69-70.)

**V. If the Stop of Defendant's Vehicle Was Lawful, Did the Fish and Game Warden Nonetheless Violate the Fourth Amendment in Searching Defendant's Vehicle and Seizing the Lobster Found Therein?**

Finally, defendant contends that even if the stop of his vehicle was lawful, the evidence obtained by Fleet should still be suppressed because Fleet's subsequent search of his vehicle and the black bag contained therein — which led to the discovery of the evidence in question — was unconstitutional. We disagree.

As noted above, after stopping defendant's vehicle Fleet asked defendant whether he had any fish or lobsters in his car and defendant responded that he did not.[17] Because Fleet had personally observed defendant catch either a fish or a lobster on the pier, place the item in a black bag, take the bag to his vehicle in the pier parking lot, and drive out of the lot, Fleet reasonably believed that defendant was lying to him when he denied having any fish or lobsters in his vehicle. Under these circumstances, Fleet had probable cause to believe (1) that defendant was in violation of section 2012 requiring a person to exhibit his catch upon demand, (2) that evidence of that violation was reasonably likely to be present in the black bag into which the game warden had seen defendant place his catch, and (3) that the black bag was reasonably likely to be in the vehicle defendant was driving away from the pier. Accordingly, Fleet's ensuing search of defendant's vehicle for the black bag, his search of the black bag itself, and his discovery and seizure of the unlawfully taken lobster from inside the bag all were supported by probable

---

**17** Although Fleet's question to defendant did not expressly "demand" the display of any fish or lobsters in the vehicle, we believe it is clear that in context the game warden's question to defendant, who had just left the pier after fishing, reasonably would have been so understood, and neither defendant nor the Court of Appeal suggests otherwise. (See, e.g., *People v. Maxwell* (1969) 275 Cal.App.2d Supp. 1026, 1028 [construing game warden's statement to anglers as impliedly demanding display of catch].) By denying that he had any fish or lobsters in his vehicle when he had a lobster, defendant failed to display his catch upon demand.

cause and thus did not violate the Fourth Amendment. (See, e.g., *United States v. Ross* (1982) 456 U.S. 798, 817-824.)[18]

## VI. Conclusion

For the reasons discussed above, the Court of Appeal judgment, upholding the trial court's suppression of evidence obtained by the game warden and its subsequent dismissal of the charges against defendant, is reversed.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
COFFEE, J.P.T.*

---

**18**　　Because defendant's conduct after being lawfully stopped provided Fleet with probable cause to search defendant's vehicle and the black bag within the vehicle, we have no occasion in this case to determine (1) whether section 1006 authorizes a game warden to search a vehicle occupied by an angler or hunter (or a receptacle within such a vehicle) without probable cause or reasonable suspicion, or (2) if section 1006 authorizes such a search, whether such a search would be permissible under the Fourth Amendment. (See, e.g., *People v. Maxwell, supra,* 275 Cal.App.2d Supp. at pp. 1027-1029 [upholding game warden's suspicionless search of sack carried by anglers disembarking from fishing boat when warden reasonably believed sack contained fish]; *People v. Johnson* (1980) 108 Cal.App.3d 175, 179 [upholding game warden's search of sack in a vehicle occupied by a hunter when warden reasonably believed sack contained pheasants].)

*　　Associate Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Maikhio

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 180 Cal.App.4th 1178
**Rehearing Granted**

_____

**Opinion No.** S180289
**Date Filed:** June 20, 2011

_____

**Court:** Superior
**County:** San Diego
**Judge:** David B. Oberholtzer

_____

**Counsel:**

Jan I. Goldsmith, City Attorney, David P. Greenberg and Andrew Jones,, Assistant City Attorneys, Monica A. Tiana and Jonathan I. Lapin, Deputy City Attorneys, for Plaintiff and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Matthew Rodriquez, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Carol A. Squire, Deborah Fletcher and Nicholas Stern, Deputy Attorneys General, for California Department of Fish and Game as Amicus Curiae on behalf of Plaintiff and Appellant.

Steven J. Carroll, Public Defender, Randy Mize, Chief Deputy Public Defender, Gary R. Nichols, Matthew Braner and Jessica Marshall, Deputy Public Defenders, for Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jonathan I. Lapin
Deputy City Attorney
1200 Third Avenue, Suite 700
San Diego, CA  92101-4103
(619) 533-5500

Nicholas Stern
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 323-3840

Matthew Braner
Deputy Public Defender
450 B Street, Suite 900
San Diego, CA  92101
(619) 338-4705